# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**HASSAN AOUN, PRO SE**
Plaintiff,

v.

**CITY OF DEARBORN HEIGHTS;**
**and HASSAN AHMAD, individually**
**and in his official capacity,**

Defendants.

Case No. 2:26-cv-12275
Hon. Jonathan J.C. Grey
Magistrate Judge Elizabeth A. Stafford

---

Hassan Aoun
P.O. Box 1132
Dearborn, MI 48121
AOUN1980@aol.com

---

## FIRST AMENDED VERIFIED COMPLAINT
## FOR VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
## FIRST AND FOURTEENTH AMENDMENTS
## JURY DEMAND REQUESTED

Plaintiff Hassan Aoun, proceeding pro se, files this First Amended Verified

Complaint against Defendants City of Dearborn Heights and Hassan Ahmad,

individually and in his official capacity, and states as follows:

1

## INTRODUCTION

1. This civil-rights action arises from the restriction of Plaintiff's protected speech during the public-comment portion of the June 23, 2026 Dearborn Heights City Council meeting.

2. Plaintiff attended the meeting to question municipal officials about permit compliance, municipal oversight, government accountability, and work associated with Hassan Saab.

3. Plaintiff approached the podium, was recognized as the public-comment speaker, and began asking whether the required permit had been obtained before the work at issue was performed.

4. While Plaintiff remained the recognized speaker, Defendant Hassan Ahmad, acting as the chair or presiding official, interrupted Plaintiff and prevented him from completing his remarks.

5. Plaintiff was not making a true threat, inciting violence, physically interfering with the meeting, speaking from the audience, interrupting another speaker, refusing to leave after the expiration of a neutral time limit, or preventing the City Council from conducting its business.

6. Defendant Ahmad did not identify a neutral time limit, relevance requirement, or viewpoint-neutral decorum rule that Plaintiff had violated.

**7.** Plaintiff objected to the restriction, stated that he would seek federal injunctive relief, and left the meeting voluntarily.

**8.** After Plaintiff left, Defendant Ahmad permitted or invited Mr. Saab to address the same permit issue that Plaintiff had raised.

**9.** Mr. Saab stated that the permit had been pulled, and Mayor Moe Baydoun also addressed the matter and stated that the permit amount was approximately $105,000.

**10.** The discussion that occurred after Plaintiff left demonstrates that the permit issue was relevant to municipal business and appropriate for discussion before the City Council.

**11.** The timing and sequence of events support a reasonable inference that Plaintiff was interrupted and silenced because he questioned permit compliance involving Mr. Saab and because of the critical viewpoint expressed through his questions.

**12.** Before June 23, 2026, the City had been confronted with other allegations of retaliation connected to speech concerning permit or ordinance compliance and speech made at a Dearborn Heights City Council meeting.

3

**13.** In Hachem v. City of Dearborn Heights, Michigan Court of Appeals No. 367544, a former City department director alleged retaliation after reporting a suspected ordinance violation involving construction and paving work associated with Mr. Saab.

**14.** The Michigan Court of Appeals held that genuine issues of material fact existed concerning protected activity, causation, retaliation, and pretext, vacated summary disposition, and remanded the matter for further proceedings.

**15.** The Court of Appeals did not enter a final judgment that retaliation occurred. It held, however, that the evidence was sufficient for a jury to determine whether the City employee was retaliated against after reporting a suspected ordinance violation.

**16.** Plaintiff does not presently allege that Mr. Saab held a City Council position at the time of the property-related events described in Hachem. The relevant similarity is that both matters involved alleged adverse treatment after a person raised permit or ordinance-compliance concerns involving Mr. Saab.

**17.** The City also received notice through separate federal litigation of sworn allegations that a Dearborn Heights employee suffered retaliation because of speech at a City Council meeting.

4

18. Despite these prior warnings, the City failed to implement adequate First Amendment training, supervision, and corrective procedures governing retaliation, viewpoint discrimination, and the treatment of recognized public-comment speakers.

19. Plaintiff brings individual-capacity claims against Defendant Ahmad for personally restricting and retaliating against Plaintiff's protected speech.

20. Plaintiff brings municipal-liability claims against the City based on its alleged policies, customs, practices, delegated authority, deliberate indifference, failures to train and supervise, and ratification. PARTIES

**PARTIES**

21. Plaintiff Hassan Aoun is an individual who attends public meetings, speaks during public-comment periods, criticizes public officials, and petitions government concerning matters of public concern.

22. Defendant City of Dearborn Heights is a Michigan municipal corporation located in Wayne County, Michigan.

23. Defendant Hassan Ahmad was, at all relevant times, acting as the chair or presiding official of the Dearborn Heights City Council meeting.

24. Defendant Ahmad exercised governmental authority over the recognition of speakers, the administration of public comment, meeting procedure, and decorum.

5

**25.** Defendant Ahmad acted under color of state law when he interrupted and restricted Plaintiff's public-comment speech.

**26.** Defendant Ahmad is sued in his individual capacity for damages arising from his personal participation in the alleged constitutional violations.

**27.** Defendant Ahmad is also sued in his official capacity for declaratory and prospective injunctive relief. JURISDICTION AND VENUE

## JURISDICTION AND VENUE

**28.** This action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

**29.** This Court has federal-question jurisdiction under 28 U.S.C. § 1331.

**30.** This Court has civil-rights jurisdiction under 28 U.S.C. § 1343(a)(3) and (4).

**31.** This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

**32.** This Court may grant appropriate equitable relief under 42 U.S.C. § 1983 and its inherent equitable authority.

**33.** Venue is proper under 28 U.S.C. § 1391(b) because Defendants are located within this District and the events giving rise to the claims occurred in Dearborn Heights, Wayne County, Michigan, within the Eastern District of Michigan, Southern Division. LEGAL FRAMEWORK

6

## LEGAL FRAMEWORK

34. Section 1983 provides a remedy against a person who, under color of state law, causes the deprivation of a right secured by the Constitution or federal law.

35. The First Amendment protects political speech, criticism of government officials, discussion of municipal affairs, and the right to petition government for redress of grievances.

36. These protections apply to state and local government through the Fourteenth Amendment.

37. A public-comment period established by a city council is generally treated as a limited public forum.

38. Within a limited public forum, the government may enforce reasonable and viewpoint-neutral restrictions concerning time, place, manner, relevance, and actual disruption.

39. The government may not restrict speech merely because an official dislikes the speaker's criticism, disagrees with the speaker's viewpoint, considers the speech embarrassing, or wishes to shield another official from scrutiny.

7

40. Restrictions aimed at abusive, antagonistic, or personally directed criticism may constitute viewpoint discrimination when those standards are applied to suppress unfavorable views. Ison v. Madison Local School District Board of Education, 3 F.4th 887, 893-95 (6th Cir. 2021). In Boddy v. Grech, No. 25-3490, 2026 WL 1678609, at *4-7 (6th Cir. June 10, 2026), the Sixth Circuit likewise held that sharp criticism of public officials remains protected in a limited public forum.

41. Government officials may address actual disruption through reasonable and viewpoint-neutral measures, but they may not suppress a recognized speaker merely because officials or listeners react negatively to protected speech. See Bible Believers v. Wayne County, 805 F.3d 228, 252-55 (6th Cir. 2015) (en banc); Boddy, 2026 WL 1678609, at *7-8 (holding that the presiding official could not silence the recognized speaker instead of controlling a disruptive audience).

42. The First Amendment also prohibits government officials from taking materially adverse action against a person because that person engaged in protected speech.

43. A retaliation claim is supported where a plaintiff engaged in protected conduct, suffered an adverse action capable of deterring a person of ordinary firmness, and the protected conduct was a motivating factor for the adverse action.

8

**44.** A municipality may be liable under 42 U.S.C. § 1983 only when the alleged constitutional violation was caused by an official municipal policy or custom. Monell v. Department of Social Services, 436 U.S. 658, 690-95 (1978). A plaintiff may identify such a policy or custom through: (1) an illegal official policy or legislative enactment; (2) an unconstitutional action ratified by an official with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence toward federal-rights violations. Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013).

**45.** Municipal liability may not be imposed merely because the municipality employed the person who committed the alleged violation and may not rest on respondeat superior. Monell, 436 U.S. at 691, 694. The identified policy, custom, failure to train, final-policymaker decision, or ratification must be closely related to and the moving force behind the constitutional injury.

**46.** A failure-to-train or failure-to-supervise theory ordinarily requires prior instances of sufficiently similar unconstitutional conduct demonstrating that the municipality ignored a history of abuse and was clearly on notice that training or supervision in the particular area was deficient and likely to cause injury. A custom-of-tolerance theory likewise ordinarily requires a pattern of inadequately investigating or responding to similar constitutional violations. Burgess, 735 F.3d at 478-79.

9

47. A pattern is not required when a deliberate choice among available alternatives is made by an official who possesses final policymaking authority under state and local law for the subject matter in question, and that choice causes the injury. Pembaur v. City of Cincinnati, 475 U.S. 469, 481-85 (1986). Mere after-the-fact approval of an investigation, failure to discipline, or failure to correct is not by itself sufficient where the later conduct did not cause or continue the plaintiff's injury. Burgess, 735 F.3d at 479.

48. The loss of First Amendment freedoms, even for a limited period, constitutes irreparable injury for purposes of prospective equitable relief. FACTUAL ALLEGATIONS A. The June 23, 2026 City Council Meeting

## FACTUAL ALLEGATIONS

### A. The June 23, 2026 City Council Meeting

49. On June 23, 2026, Plaintiff attended a public meeting of the Dearborn Heights City Council.

50. The meeting included a public-comment period during which members of the public were permitted to address municipal officials.

51. Plaintiff approached the podium and was recognized as the public-comment speaker.

52. Plaintiff was not speaking from the audience and was not interrupting another person who held the floor.

**53.** Plaintiff raised questions concerning permit compliance, municipal oversight, public accountability, and work associated with Hassan Saab.

**54.** Plaintiff questioned whether a required permit had been pulled before a sequence of work involving the installation of a fence and subsequent demolition or removal work at or near a municipal or street location.

**55.** Plaintiff's questions concerned the enforcement of municipal requirements and whether a person associated with City government had complied with requirements applicable to other persons.

**56.** Permit compliance, municipal enforcement, use of public property, government transparency, and the conduct of public officials are matters of public concern.

**57.** While Plaintiff remained the recognized speaker and before he completed his remarks, Defendant Ahmad interrupted him.

**58.** Defendant Ahmad's interruption interfered with Plaintiff's ability to finish explaining and asking questions about the permit issue.

**59.** Plaintiff was not making a true threat.

**60.** Plaintiff was not inciting violence or unlawful conduct.

**61.** Plaintiff was not physically interfering with the meeting.

**62.** Plaintiff was not blocking access to the Council, podium, or meeting room.

**63.** Plaintiff was not speaking over another recognized public-comment speaker.

64. Plaintiff was not refusing to leave the podium after the expiration of a neutral and uniformly enforced time limit.

65. Plaintiff was not preventing the City Council from proceeding with its business.

66. Defendant Ahmad did not inform Plaintiff that a neutral time limit had expired.

67. Defendant Ahmad did not identify a neutral relevance rule that Plaintiff had violated.

68. Defendant Ahmad did not identify specific conduct constituting an actual material disruption.

69. Defendant Ahmad did not explain why Plaintiff's permit-compliance question was outside the permissible scope of public comment.

70. During the exchange, City Attorney Gary Miotke stated in substance that the Chief of Police could remove Plaintiff for disruption and that the decision rested with the Chief.

71. The Chief of Police did not remove Plaintiff.

72. The Chief's decision not to remove Plaintiff supports a reasonable inference that Plaintiff's conduct did not create an actual material disruption requiring police intervention.

73. Plaintiff objected to the interruption and asserted that he was entitled to complete his comments because he had not threatened anyone or prevented the meeting from continuing.

74. Plaintiff stated that he would seek injunctive relief in federal court.

75. Plaintiff then left the meeting voluntarily.

76. After Plaintiff left, Defendant Ahmad permitted or invited Mr. Saab to respond to the same permit issue Plaintiff had raised.

77. Mr. Saab stated that the permit had been pulled.

78. Mayor Moe Baydoun also addressed the permit issue and stated that the permit amount was approximately $105,000.

79. By permitting City officials to address the permit issue after Plaintiff left, Defendants confirmed that the subject was relevant to municipal business.

80. A viewpoint-neutral procedure would not silence the recognized speaker raising a critical question and then permit the person criticized to address that same question only after the speaker had departed.

81. Mr. Saab also asserted that Plaintiff had been harassing him on Facebook.

82. Plaintiff disputes that characterization.

83. Statements about alleged Facebook activity did not provide a lawful basis to prevent Plaintiff from completing protected public-comment remarks concerning permit compliance.

13

**84.** The timing and sequence of the interruption support a reasonable inference that Defendant Ahmad acted because Plaintiff's questions criticized or embarrassed Mr. Saab or placed Mr. Saab's permit compliance under public scrutiny.

**85.** Defendant Ahmad's conduct caused Plaintiff to lose the opportunity to complete his public comment.

**86.** The restriction would deter a person of ordinary firmness from asking critical questions about City officials, permits, politically sensitive matters, or municipal accountability.

**87.** Plaintiff intends to continue attending and speaking at Dearborn Heights public meetings.

**88.** Plaintiff reasonably fears that he will again be interrupted, silenced, threatened with removal, or subjected to police involvement if he raises critical questions concerning permits, City officials, public funds, public property, municipal work, or government accountability. B. Prior Permit- and Ordinance-Related Retaliation Allegations

**B. Prior Permit- and Ordinance-Related Retaliation Allegations**

**89.** After reviewing judicial records, Plaintiff identified Hachem v. City of Dearborn Heights, Michigan Court of Appeals No. 367544, which concerned alleged retaliation by Dearborn Heights officials after a City employee reported a suspected ordinance violation.

**90.** Jihad Hachem served as Director of the Dearborn Heights Community and Economic Development Department.

**91.** Hachem alleged that construction and paving work at property associated with Hassan Saab violated City ordinances and contributed to flooding on neighboring property.

**92.** Hachem reported the suspected ordinance violation to then-Mayor Bilal Bazzi.

**93.** According to Hachem's testimony, Bazzi responded in substance: "Don't worry about ordinances. Worry about your department."

**94.** Hachem alleged that Bazzi's treatment of him became hostile after the report and that he was later removed from his position.

**95.** The trial court granted summary disposition to the defendants.

**96.** The Michigan Court of Appeals later vacated that ruling and remanded the matter for continued proceedings.

**97.** The Court of Appeals held that reasonable jurors could differ on whether Hachem made a protected report of a suspected ordinance violation, whether retaliatory conduct followed, and whether the City's stated reasons for removing him were pretextual.

**98.** The Court of Appeals emphasized that motive, intent, witness credibility, and competing versions of events were questions for a factfinder rather than issues to be resolved through summary disposition.

**99.** The Court of Appeals did not enter a final liability judgment against the City.

**100.** The decision nevertheless established that Hachem had presented sufficient evidence to require further proceedings on his claim that he suffered retaliation after reporting a suspected ordinance violation involving property associated with Mr. Saab.

**101.** Plaintiff does not presently assert that Mr. Saab was a City Council member when the property-related events in Hachem occurred.

**102.** The relevant connection is that the earlier case involved alleged retaliation after a City employee raised ordinance and permit-related concerns involving Mr. Saab.

**103.** The present case involves alleged retaliation and speech restriction after a member of the public raised another permit-compliance question involving Mr. Saab.

**104.** The Hachem litigation placed the City on notice that allegations of retaliation connected to permit and ordinance concerns involving Mr. Saab had sufficient evidentiary support to proceed beyond summary disposition. C. Prior Allegations of Retaliation for City Council Speech

**C. Prior Allegations of Retaliation for City Council Speech**

105. Plaintiff also identified federal litigation containing sworn deposition testimony and affidavits concerning alleged retaliation against a Dearborn Heights employee for speech at a City Council meeting.

106. In March 2025, Janet Lucas, an Administrative Assistant with the Dearborn Heights Police Department, gave deposition testimony concerning alleged retaliation by Police Chief Jerrod Hart.

107. As described in the federal court's October 9, 2025 order in Case No. 2:23cv-12790, Lucas testified that Chief Hart removed the Accreditation Manager position in retaliation for the employee's comments at a City Council meeting. See ECF No. 38-6, PageID.1333.

108. Lee Gavin, a former Chief of the Dearborn Heights Police Department, also gave deposition testimony.

109. Gavin testified that the employee remained on administrative leave for an extended period in retaliation for speaking at the City Council meeting. See ECF No. 38-3, PageID.1255.

110. In July 2025, Sergeant Mohamad Bazzy of the Dearborn Heights Police Department submitted an affidavit.

**111.** As described in the October 9, 2025 order, Sergeant Bazzy stated that Chief Hart and others discussed pushing the employee out after he spoke at the City Council meeting and because of his investigation involving Mr. Fawaz. See ECF No. 46-2.

**112.** Hussein Farhat, a former Interim Chief of the Dearborn Heights Police Department, also submitted an affidavit.

**113.** Farhat described unusual scrutiny and hostility concerning the employee's administrative leave and alleged retaliation involving the expiration of a promotional list without promoting the employee. See ECF No. 46-3.

**114.** The federal court denied the employee's motion to add retaliation claims because the amendment was sought after substantial delay, after discovery had closed, and after summary-judgment proceedings.

**115.** The federal court did not adjudicate the proposed First Amendment retaliation claim on its merits.

**116.** The federal court did not determine that the sworn deposition testimony or affidavits were false.

**117.** Because the City and its officials were parties to that litigation, the sworn testimony and affidavits gave the City notice of allegations that municipal employees had suffered retaliation connected to protected City Council speech.

**118.** The Hachem litigation and the federal litigation presented the City with related warnings: alleged retaliation concerning permit or ordinance enforcement and alleged retaliation concerning speech at a City Council meeting.

**119.** The June 23, 2026 restriction of Plaintiff's permit-related public comment combined those same concerns: speech at a City Council meeting questioning permit compliance involving Mr. Saab. MUNICIPAL-LIABILITY ALLEGATIONS

## MUNICIPAL-LIABILITY ALLEGATIONS

**120.** Plaintiff incorporates Paragraphs 1 through 119 as if fully restated.

**121.** The City established the public-comment period as a limited public forum.

**122.** The City delegated authority to its chair or presiding official to recognize speakers, administer public-comment procedures, enforce speaking rules, and maintain order.

**123.** Defendant Ahmad exercised that delegated municipal authority when he interrupted and restricted Plaintiff's speech.

**124.** The City was responsible for training and supervising officials who exercised governmental power over recognized public-comment speakers.

125. The administration of public comment is a recurring municipal function involving an obvious risk of constitutional injury when officials are not trained to distinguish protected criticism from actual material disruption.

126. Before June 23, 2026, the City had notice through Hachem of substantial allegations that a City employee suffered retaliation after raising a suspected ordinance violation involving property associated with Mr. Saab.

127. Before June 23, 2026, the City also had notice through federal litigation of sworn allegations that a City employee suffered retaliation because of protected speech at a Dearborn Heights City Council meeting.

128. These prior matters gave the City reason to examine whether its officials were retaliating against persons who raised politically sensitive concerns, criticized municipal officials, questioned ordinance enforcement, or spoke at City Council meetings.

129. These prior matters gave the City an opportunity to investigate, correct, train, supervise, and discipline municipal officials before Plaintiff's June 23, 2026 public comment.

130. Despite this notice, the City failed to provide adequate First Amendment training concerning viewpoint discrimination and retaliation.

20

131. The City failed to train presiding officials that criticism of a council member, contractor, politically connected person, permit decision, or municipal project remains protected speech.

132. The City failed to train officials that a recognized speaker may not be silenced merely because the speaker's criticism is embarrassing, antagonistic, politically sensitive, or unwelcome.

133. The City failed to train officials to identify and articulate the neutral rule allegedly violated before restricting a recognized speaker.

134. The City failed to train officials concerning the distinction between a true threat or actual material disruption and speech that merely provokes disagreement or audience reaction.

135. The City failed to train officials concerning the constitutional distinction between a recognized speaker at the podium and a person interrupting proceedings from the audience.

136. The City failed to train officials that the lawful response to audience reaction is to control the audience through viewpoint-neutral measures rather than silence the recognized speaker.

137. The City failed to adequately supervise officials exercising authority over public-comment proceedings.

21

**138.** The City failed to establish an effective procedure for reviewing restrictions imposed on recognized public-comment speakers.

**139.** The City failed to adequately investigate or correct the prior allegations of retaliation relevant to permit enforcement and City Council speech.

**140.** The City's failure to respond adequately to those warnings communicated that officials could interfere with critical speech without meaningful review or corrective consequences.

**141.** Defendant Ahmad's interruption of Plaintiff while Plaintiff questioned permit compliance was a foreseeable consequence of those training and supervisory failures.

**142.** The City's deliberate indifference was a moving force behind the restriction and retaliation alleged in this action.

**143.** Alternatively, Defendant Ahmad's challenged action constituted municipal policy only to the extent Michigan law, the City Charter, ordinances, council rules, resolutions, or an authorized delegation gave him final policymaking authority - not merely discretionary or unreviewed decision-making authority - over the particular subject of restricting recognized public-comment speakers.

144. Plaintiff further alleges ratification or a custom of tolerance only to the extent discovery establishes that an authorized final policymaker knowingly approved the challenged decision and its unconstitutional basis, or that the City maintained a pattern of inadequately investigating or correcting sufficiently similar violations. Plaintiff does not rely solely on the City's employment of Defendant Ahmad, a single after-the-fact failure to discipline, or respondeat superior. COUNT I 42 U.S.C. § 1983 - FIRST AMENDMENT VIEWPOINT DISCRIMINATION AND UNLAWFUL SPEECH RESTRICTION Against Defendant Hassan Ahmad in His Individual Capacity

## COUNT I

### 42 U.S.C. § 1983 - FIRST AMENDMENT VIEWPOINT DISCRIMINATION AND UNLAWFUL SPEECH RESTRICTION

### *Against Defendant Hassan Ahmad in His Individual Capacity*

145. Plaintiff incorporates Paragraphs 1 through 144 as if fully restated.

146. Plaintiff engaged in protected speech when he questioned permit compliance, municipal enforcement, government transparency, and public accountability during the public-comment period.

147. Defendant Ahmad acted under color of state law and exercised governmental authority over Plaintiff's access to the public-comment forum.

148. Defendant Ahmad interrupted and restricted Plaintiff before Plaintiff completed his remarks.

149. The restriction was not based on the expiration of a neutral time limit.

150. The restriction was not based on a true threat, incitement, physical obstruction, or actual material disruption.

151. Defendant Ahmad permitted Mr. Saab to answer the same permit question after Plaintiff left.

152. The subject matter was therefore relevant to City business and within the scope of public comment.

153. The timing, context, and unequal treatment support a reasonable inference that Defendant Ahmad restricted Plaintiff because of Plaintiff's critical viewpoint and questions concerning Mr. Saab.

154. Defendant Ahmad's conduct deprived Plaintiff of rights secured by the First and Fourteenth Amendments.

155. As a direct and proximate result, Plaintiff lost his opportunity to complete his public comment, experienced a chilling of protected speech, and suffered compensable constitutional injury. COUNT II 42 U.S.C. § 1983 - FIRST AMENDMENT RETALIATION Against Defendant Hassan Ahmad in His Individual Capacity

## COUNT II

### 42 U.S.C. § 1983 - FIRST AMENDMENT RETALIATION

#### *Against Defendant Hassan Ahmad in His Individual Capacity*

156. Plaintiff incorporates Paragraphs 1 through 155 as if fully restated.

157. Plaintiff engaged in constitutionally protected activity by questioning a municipal permit, criticizing government conduct, and petitioning City officials during public comment.

158. Defendant Ahmad knew the content and viewpoint of Plaintiff's speech because he heard Plaintiff's questions before interrupting him.

159. Defendant Ahmad took adverse action by interrupting Plaintiff, restricting his ability to complete his remarks, permitting discussion of possible police removal, and causing Plaintiff to leave without completing his public comment.

160. That action was sufficient to deter a person of ordinary firmness from engaging in similar criticism at future City meetings.

161. Plaintiff's protected speech was a motivating factor in Defendant Ahmad's conduct.

162. The causal connection is supported by the immediate timing of the interruption, the absence of an identified neutral violation, and the decision to allow Mr. Saab to address the same permit issue only after Plaintiff left.

**163.** Defendant Ahmad's conduct violated Plaintiff's First Amendment right to be free from government retaliation for protected speech and petitioning activity.

**164.** As a direct and proximate result, Plaintiff suffered constitutional injury, loss of speaking opportunity, chilling of speech, and damages. COUNT III 42 U.S.C. § 1983 - MUNICIPAL LIABILITY UNDER MONELL Against the City of Dearborn Heights

## COUNT III

## 42 U.S.C. § 1983 - MUNICIPAL LIABILITY UNDER MONELL
### *Against the City of Dearborn Heights*

**165.** Plaintiff incorporates Paragraphs 1 through 164 as if fully restated.

**166.** Plaintiff alleges municipal liability through the theories recognized in Monell and Burgess: an official policy or enactment; a decision by an official with final policymaking authority; a deliberately indifferent failure to train or supervise; and a custom of tolerance or acquiescence toward sufficiently similar federal-rights violations.

**167.** Before Plaintiff's June 23, 2026 incident, the City had notice of substantial allegations of retaliation connected to a suspected ordinance violation involving property associated with Mr. Saab.

**168.** The City also had notice of sworn allegations of retaliation against an employee because of speech at a Dearborn Heights City Council meeting.

26

169. Plaintiff alleges that these prior matters were sufficiently related to place the City on notice of a recurring risk that officials would treat persons adversely for raising politically sensitive ordinance concerns or engaging in protected City Council speech. Whether those matters establish a legally sufficient pattern is a fact-dependent issue to be tested through discovery.

170. Despite that alleged notice, the City failed to adequately investigate the identified risk, determine whether corrective measures were required, and implement constitutionally adequate procedures governing restrictions on recognized public-comment speakers.

171. The City failed to provide adequate training concerning viewpoint neutrality, First Amendment retaliation, public-comment restrictions, actual material disruption, audience reaction, and criticism directed toward municipal officials or politically connected persons.

172. The City failed to adequately supervise officials exercising authority over recognized public-comment speakers and failed to establish an effective procedure for reviewing viewpoint-based restrictions.

173. Plaintiff alleges that the City's failures reflected deliberate indifference because the prior matters provided actual or constructive notice of the particular constitutional risk. Plaintiff does not rely on a generalized allegation that additional training would have been helpful.

27

**174.** Defendant Ahmad exercised authority delegated by the City when he administered the public-comment period and restricted Plaintiff's speech. Delegated discretion alone, however, does not establish final policymaking authority.

**175.** Plaintiff alleges that the City's deliberately indifferent training and supervisory deficiencies, and any proven custom of tolerance, were closely related to and moving forces behind Plaintiff's constitutional injuries.

**176.** Alternatively, the restriction constituted municipal policy if Defendant Ahmad possessed final policymaking authority under applicable Michigan and municipal law over the particular public-comment restriction and deliberately selected the challenged course of action from among available alternatives.

**177.** Alternatively, ratification supports liability only if an authorized final policymaker, with knowledge of the material facts and the unconstitutional basis of the decision, affirmatively approved the challenged restriction in a manner that caused, continued, or made official Plaintiff's constitutional injury. A mere failure to discipline or after-the-fact approval of an investigation, standing alone, is not alleged as sufficient.

**178.** As a direct and proximate result, Plaintiff suffered loss of protected speech, chilling of future expression, constitutional injury, and damages. COUNT IV DECLARATORY AND PROSPECTIVE INJUNCTIVE RELIEF Against the City of Dearborn Heights and Defendant Ahmad in His Official Capacity

## COUNT IV

## DECLARATORY AND PROSPECTIVE INJUNCTIVE RELIEF

### *Against the City of Dearborn Heights and Defendant Ahmad in His Official Capacity*

**179.** Plaintiff incorporates Paragraphs 1 through 178 as if fully restated.

**180.** Plaintiff intends to continue attending and speaking at Dearborn Heights City Council meetings.

**181.** Plaintiff intends to continue addressing permits, ordinance enforcement, public expenditures, municipal projects, conduct by City officials, and matters of government accountability.

**182.** Plaintiff reasonably fears that his speech will again be interrupted or restricted when it criticizes a City official or concerns a politically sensitive matter.

**183.** The threat is credible because Defendant Ahmad restricted Plaintiff's speech during the June 23, 2026 meeting without identifying a neutral rule Plaintiff had violated.

**184.** The City has not provided Plaintiff with assurance that the same conduct will not recur.

**185.** Future loss of First Amendment freedoms cannot be adequately remedied through damages alone.

**186.** Declaratory relief is necessary to clarify the parties' rights and responsibilities during public-comment proceedings.

**187.** Prospective injunctive relief is necessary to prevent future viewpoint-based restrictions and retaliation while preserving the City's lawful authority to enforce reasonable and viewpoint-neutral rules against true threats and actual material disruption.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and grant the following relief:

**A.** Declare that Defendant Ahmad violated Plaintiff's rights under the First and Fourteenth Amendments by restricting Plaintiff's protected public-comment speech based on its critical viewpoint or subject matter;

**B.** Declare that Defendant Ahmad retaliated against Plaintiff for engaging in protected speech and petitioning activity;

**C.** Declare that the City of Dearborn Heights is liable under 42 U.S.C. § 1983 to the extent Plaintiff's injuries were caused by a municipal policy, custom, practice, deliberately indifferent failure to train or supervise, authorized policymaker decision, or ratification;

**D.** Enter narrowly tailored preliminary and permanent injunctive relief prohibiting Defendants, their officers, officials, agents, employees, successors, and all persons acting in concert with them from interrupting, silencing, threatening removal of, or removing a recognized public-comment speaker because of the speaker's viewpoint, criticism of government officials, permit-compliance questions, political sensitivity, embarrassment to officials, or audience reaction;

**E.** Clarify that the injunction does not prevent Defendants from enforcing lawful, reasonable, and viewpoint-neutral rules concerning speaking time, relevance, true threats, physical interference, or actual material disruption;

**F.** Require Defendants to administer public-comment periods in a viewpoint-neutral manner and to distinguish protected criticism from conduct that actually prevents the meeting from continuing;

**G.** Direct Defendants to preserve video, audio, minutes, emails, text messages, policies, training materials, complaints, investigations, and other records concerning the June 23, 2026 meeting and the prior matters identified in this Complaint, to the extent such material remains subject to lawful preservation obligations;

**H.** Award Plaintiff compensatory damages against Defendants, jointly and severally where permitted by law, in the amount of Five Hundred Million

31

Dollars ($500,000,000.00), or such greater or lesser amount as may be proven at trial and determined by the jury;

**I.** Award Plaintiff nominal damages for each established constitutional violation;

**J.** Award punitive damages against Defendant Hassan Ahmad in his individual capacity, in an amount determined by the jury and permitted by law;

**K.** Award Plaintiff taxable costs, pre-judgment interest, post-judgment interest, and any other relief authorized by law; and

**L.** Grant such further legal and equitable relief as the Court considers just and proper.

## JURY DEMAND REQUESTED

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Hassan Aoun
HASSAN AOUN
Plaintiff, Pro Se
po box 1132
Dearborn MI 48121

AOUN1980@aol.com

Dated:07-14-2026

32

## VERIFICATION UNDER 28 U.S.C. § 1746

I, Hassan Aoun, declare under penalty of perjury that I have reviewed this First

Amended Verified Complaint and that the factual allegations based on my personal

knowledge are true and correct. Allegations stated on information and belief are

believed to be true based on the information presently available to me.

Hassan Aoun

33

# AUTHORITY APPENDIX INDEX

**Appendix A**     Hachem v. City of Dearborn Heights, No. 367544                          A-1 - A-11
Michigan Court of Appeals (June 20, 2024)

**Appendix B**     Reyna v. Hart, Case No. 2:23-cv-12790                                    B-1 - B-27
Opinion and Order (Oct. 9, 2025), ECF No. 52

**Appendix C**     Burgess v. Fischer, 735 F.3d 462 (6th Cir. 2013)                         C-1 - C-25
Published Sixth Circuit Opinion, No. 12-4191

**Appendix D**     Darbi Boddy v. Mary Grech, No. 25-3490                                    D-1 - D-23
Published Sixth Circuit Opinion (June 10, 2026)

# AUTHORITY APPENDIX A

# MICHIGAN COURT OF APPEALS CASE LAW

### Hachem v. City of Dearborn Heights

Michigan Court of Appeals No. 367544

Unpublished Opinion - June 20, 2024

Relevant authority concerning alleged retaliation after reporting suspected ordinance violations:

The Michigan Court of Appeals held that genuine issues of material fact existed concerning protected activity, causation, retaliation, and pretext. The court vacated summary disposition and remanded for further proceedings. Plaintiff cites the decision as notice to the City of prior allegations involving adverse treatment after permit- or ordinance-compliance concerns were raised.

> Hachem argued that Bazzi's ever-changing reasons for his termination were mere pretext. Hachem presented evidence to support that Bazzi had terminated Mayor Paletko's chief-of-staff for reporting Bazzi's alleged illegal conduct to the FBI, terminated Building Department Director Larry Domski so he could appoint a new director who granted favors to Bazzi's associates, and fired the police chief, two police officers, and police advisory board members because they refused to breach a union contract and legal requirements to resolve a matter as Bazzi desired. Hachem testified at his deposition that Bazzi's history of retaliation against him actually began when Bazzi was a city council member. Bazzi telephoned Hachem and threatened Hachem's wife who had made negative comments about Bazzi to other residents at a city council meeting.

A-1

*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JIHAD A. HACHEM,

        Plaintiff-Appellant,

v

CITY OF DEARBORN HEIGHTS and BILAL
BAZZI,

        Defendants-Appellees.

UNPUBLISHED
June 20, 2024

No. 367544
Wayne Circuit Court
LC No. 22-001951-CD

Before: YATES, P.J., and BORRELLO and GARRETT, JJ.

PER CURIAM.

In this action filed under the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq*., plaintiff, Jihad Hachem, filed suit against his employer, city of Dearborn Heights and Dearborn Heights Mayor Bilal (Bill) Bazzi (collectively defendants), for wrongful termination. Hachem alleged defendants terminated his employment because he reported that his neighbor (an alleged Bazzi "crony") violated city ordinances by paving over his backyard, leading to flooding in surrounding yards. The circuit court summarily dismissed Hachem's complaint under MCR 2.116(C)(10), and Hachem appealed as of right. The circuit court erred in summarily dismissing Hachem's retaliatory discharge claim. Although the questions of fact are close, they are still questions of fact. Summary disposition is not appropriate if the court must resolve issues of witness credibility, and credibility contests abound in this case. We vacate the order granting summary disposition in defendants' favor and remand for continued proceedings.

## I. BACKGROUND

Hachem served as director for the Dearborn Heights Community and Economic Development Department (CEDD) from February 2016 through December 2021. Hachem was appointed by former Dearborn Heights Mayor Daniel Paletko. When Paletko passed away in December 2020, the city council appointed Councilman Bazzi as the interim mayor. At that time, Bazzi became Hachem's boss.

Hachem asserts that at some point his neighbor's neighbor, Hassan Saab, paved his entire backyard in concrete to serve as a deck for his inground pool. In the summer of 2021, Hachem's

-1-

yard flooded for the first time and he believed it was caused by runoff from Saab's concrete slab. In late July or early August 2021, Hachem showed Bazzi pictures and videos of the flooding and blamed the flooding on Saab's concrete. Hachem described:

> *A.* I told him that my back yard has been flooded for the first time, and that Mr. Saab's concrete, which . . . seemed to be pretty high, is causing the water to come into my back yard and flood my back yard, coming close to my house. I showed him a video, and I showed him the pictures.

> *Q.* How did . . . the Mayor respond to that?

> *A.* He just looked at me, and said don't worry about ordinances. Worry about your department.

* * *

> *A.* . . . I thought by bringing this up, he would take action and address the situation.

> *Q.* What could he have done?

> *A.* Check with ordinances, check with building department, maybe go look at the property. Do whatever action he needs to do to make sure that is in compliance.

Hachem discussed the issue with Bazzi again in late August 2021, before a city council meeting. Bazzi "just brushed me off at the time, saying it's not the time, and we'll talk about it at a different time." Hachem admitted he never cited the ordinance sections allegedly violated by Saab, claiming it was general knowledge for city department heads that property owners could only build up 30 to 35% of the property, and that if someone paves 100% of the property "obviously there is something wrong." But Hachem "believed" he "said it's against the ordinance of the City."

Hachem alleged that following his reports, Bazzi "exhibited a hostile tone and demeanor toward" him. Hachem further alleged that Bazzi "regularly attempted to micromanage the CEDD in [Hachem's] absence, undermined [Hachem] with his subordinates and was hypercritical of his performance." Bazzi refused to take meetings with Hachem, preventing Hachem from successfully doing his job. Hachem was required to file reports with the state and federal governments, but could not timely file them without Bazzi's approval. Mayor Bazzi won the November 2021 general election, and started his first term as elected mayor in January 2022. Bazzi terminated Hachem in December 2021. Bazzi described: "I unappointed him." Bazzi explained that he reorganized city departments and eliminated Hachem's position.

Hachem filed suit, alleging wrongful termination in violation of the WPA. Hachem alleged his termination was based on his report of an ordinance violation by Saab, "a longtime Bazzi crony." After describing the hostile work environment that followed his report, Hachem alleged Bazzi waited to terminate him to ensure his support in winning the election. Hachem further alleged that Bazzi had "a predisposition to retaliate against those who refuse to violate the law in

-2-

A-3

his service or who report his illegal activity," and cited examples of other employees terminated following Bazzi's appointment.

Following discovery, defendants sought summary disposition under MCR 2.116(C)(10). Defendants contended that Hachem's conversations with Bazzi about flooding, which came during a state of emergency after record rainfall in Wayne County, were not "reports" or "protected activity" under the WPA. Defendants cited a lack of evidence of causation. And defendants asserted Bazzi's employment decision was based on legitimate, nondiscriminatory reasons: the reorganization of Hachem's former department, Hachem's failure to meet job expectations, and Bazzi's lack of trust in Hachem after his unauthorized three-week vacation to Lebanon and arrest while there.

Hachem retorted that he referred to an ordinance violation during his discussions with Bazzi, and claimed the immediacy of Bazzi's changed treatment of him was evidence of causation. Hachem refuted Bazzi's criticisms of his performance with a congratulatory letter sent to him by the United States Department of Housing and Urban Development. He testified at his deposition that Bazzi approved his vacation plans, but had someone destroy the notes in Hachem's desk to prove that point. Hachem further noted he entered the vacation in the city's leave request system and it was approved by someone in the mayor's office. Hachem denied that he was arrested in Lebanon, claiming he was merely detained briefly at the airport.

Hachem argued that Bazzi's ever-changing reasons for his termination were mere pretext. Hachem presented evidence to support that Bazzi had terminated Mayor Paletko's chief-of-staff for reporting Bazzi's alleged illegal conduct to the FBI, terminated Building Department Director Larry Domski so he could appoint a new director who granted favors to Bazzi's associates, and fired the police chief, two police officers, and police advisory board members because they refused to breach a union contract and legal requirements to resolve a matter as Bazzi desired. Hachem testified at his deposition that Bazzi's history of retaliation against him actually began when Bazzi was a city council member. Bazzi telephoned Hachem and threatened Hachem's wife who had made negative comments about Bazzi to other residents at a city council meeting.

Hachem also presented significant evidence to explain his specific theory that Bazzi terminated him for reporting Saab's concrete project. Hachem contended the reasons for his termination were mere pretext to cover up Bazzi's resentment at being complicit in the very ordinance violation brought to his attention. Domski did not testify directly about the backyard paving project at Saab's house but about the first step of Saab's "remodeling" project. Saab secured a permit to renovate his newly purchased house. After receiving a tip from another citizen, Domski inspected Saab's site and discovered he was demolishing his house, not remodeling it. Demolition and reconstruction require different permits and are subject to different regulations. Domski ordered Saab to cease his work. Saab went to Bazzi, who was then on the city council. Domski alleged Saab and Bazzi accused him of demanding a bribe. Although Bazzi later claimed it was just a misunderstanding, Domski was upset by the accusation and refused to supervise Saab's project any further. The backyard paving project occurred after this disagreement and under the watchful eye of Building Inspector Rick Watland, who Domski alleged was widely known to be corrupt. Hachem supported this version of events by testifying that Saab completed most of his construction work after dark. Hachem contacted the police one night because of the excessive noise. Saab responded with a profanity-laden tirade against him. Hachem claimed,

-3-

A-4

however, that he did not know of Bazzi's role in Saab's construction scheme when he reported the flooding issue to Bazzi.  Hachem contends that Bazzi retaliated because he did not want his participation in this event to come to light.

The circuit court summarily dismissed Hachem's claim.  The court noted that the city department directors were at-will employees, appointed "at the liberty of each mayor."  Mayor Bazzi replaced several directors after his appointment, including Hachem.

The court acknowledged that Hachem had two conversations with Bazzi about the flooding, stated he believed the flooding was caused by Saab's concrete work, and showed Bazzi a video and pictures of the water in his backyard.  "Bazzi then told [Hachem] that he should worry about his own department."  Hachem also complained to three city council members and the human resources director and showed them his video as well.  But, the court noted, Hachem never reported his concerns to anyone in the building or ordinance departments directly.  The court accepted defendants' contention that "Mayor Bazzi gave little to [no] credence to [Hachem's] concern about pooling water from a neighbor-to-neighbor situation" because he was busy dealing with historic flooding throughout the city.

The court summarized the allegations in Hachem's complaint, as well as defendants' position that Hachem failed to make an actual report: as a director, Hachem knew who he should advise about Saab's alleged code violations and never did so.  The court also acknowledged defendants' position that there was no causal connection between the reports and Hachem's termination and that Hachem did not overcome the legitimate reasons for his termination.

The court reasoned that although Hachem was an at-will employee, his employer could not terminate his employment if it would contravene public policy.

> Termination of at-will employment is typically pr[o]scribed by public policy in Michigan in three situations; one, adverse treatment of the right or duty; an employee's failure [or] refusal to violate a law in the course of employment, employee's exercise of a right conferred by a well established legislative enactment.  Also contained within that case is indication that the law does not require a plaintiff to explicitly state that he or she possess an intent to report a violation of the law in the immediate future in order to establish that the plaintiff was about to report such activity.  However, and this is what defendant[s] rel[y] on, an employer is entitled to objective notice of a report or threat to report of a whistleblower.  And they argue that did not happen in this case.

The court concluded that the evidence did not support that Hachem made a protected report. Hachem did not indicate "which ordinance was violated, nor as a director of the City department did plaintiff make an objective report with the building department or any other City department."

> To that end [Hachem's] discussion with defendant Bazzi cannot be characterized as a report under the WPA, but rather inquiry as to whether [Hachem's] neighbor allegedly violated a City ordinance. . . .   [Hachem] provided . . . testimony demonstrating from the former building director claiming

-4-

that Saa[b] violated an ordinance that was provided three months after [Hachem] was fired and six months after the complaint to defendant Bazzi.

The court ruled that Hachem did not create a triable question of fact that he made a protected report because there was no evidence "Hachem knew of a city ordinance violation at the time he discussed the matter with defendant Bazzi." The conversation was therefore "an inquir[y] into a city ordinance violation that was at the time hypothetical." Absent a report, there was no protected activity. To give the ruling more context, the court noted the governor had declared a state of emergency because substantial rainfall had led to significant flooding in the city. Moreover, Hachem shared his videos with others, including the city's human resources director. That director believed Hachem was merely sharing his hardship, like everyone else in the city at that time. Further, there is no indication that Mayor Bazzi knew Hachem had expressed his concerns to three city council members and the human resources director. Accordingly, the court found no objective notice of a report.

The circuit court continued that even if Hachem's discussions with Bazzi could be deemed "reports," he still could not establish the necessary causal connection between those reports and his termination.

> All [Hachem] has provided here is that he was fired from his at-will employment . . . four months after the discussion with defendant Bazzi. HR director [Elisabeth Sabota-]Perry did not talk to defendant Bazzi about her conversation with [Hachem]. Nor did defendant Bazzi know that [Hachem's] neighbor violated a city ordinance by concreting over his backyard with any specificity. Although the employment actions about which [Hachem] complains occurred after this [supposed] report[,] a temporal relationship standing alone does not demonstrate a causal connection between a protect[ed] activity in an adverse employment action.

The court also relied on the city's charter, which all directors knew gave the mayor authority to replace them with directors of his choosing.

The court also accepted defendants' evidence that Hachem was terminated for a legitimate, nondiscriminatory reason. Specifically, Bazzi combined two departments to save the city money.

Hachem now appeals the dismissal of his action.

## II. STANDARDS OF REVIEW

We review de novo a circuit court's resolution of a summary disposition motion. *Wright v Genesee Co*, 504 Mich 410, 417; 934 NW2d 805 (2019). This "means that we review the legal issue independently, without required deference to the courts below." *Id*. As summarized in *Williamson v AAA of Mich*, 343 Mich App 496, 502-503, 997 NW2d 296 (2022):

> A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5),

-5-

A-6

> in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. [*Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999).]

> "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). Underlying the trial court's summary disposition ruling are issues of statutory interpretation, which we also review de novo. *Candler* [*v Farm Bureau Mut Ins Co of America*], 321 Mich App [772, 777; 910 NW2d 666 (2017)].

Of import in this case, we must remember that "it is well settled that the circuit court may not weigh the evidence or make determinations of credibility when deciding a motion for summary disposition." *Patrick v Turkleson*, 322 Mich App 595, 605; 913 NW2d 369 (2018).

### III.  LEGAL PRINCIPLES

An action for retaliatory discharge in violation of the WPA is governed by MCL 15.362, which states:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee . . . reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to the law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false. . . .

The WPA was enacted to protect "employees who report a violation or suspected violation of state, local, or federal law. . . ." *Whitman v City of Burton*, 493 Mich 303, 312; 831 NW2d 223 (2013) (quotation marks and citation omitted). To achieve this goal, the WPA removes "barriers that may interfere with employee efforts to report" violations and creates "a cause of action for an employee who has suffered an adverse employment action for reporting or being about to report a violation or suspected violation of the law." *Id*.

To establish a prima facie case of retaliatory discharge under the WPA, a plaintiff must show "(1) the plaintiff was engaged in protected activity as defined by the act, (2) the defendant took an adverse employment action against the plaintiff, and (3) a causal connection exists between the protected activity and the adverse employment action." *Debano-Griffin v Lake Co*, 493 Mich 167, 175; 828 NW2d 634 (2013) (quotation marks and citation omitted). This showing can be made through direct or circumstantial evidence. Where, as here, the plaintiff's claims rest on circumstantial evidence from which the factfinder could infer that he or she suffered unlawful retaliation, a burden-shifting analysis applies. Once a prima facie case is established with circumstantial evidence, the burden shifts to the defendant employer to articulate a legitimate business reason for the adverse employment action. If the defendant does so, the burden returns

-6-

A-7

to the plaintiff to establish that the proffered legitimate reason was merely a pretext for the adverse employment action. *Id.* at 176

## IV. ANALYSIS

Hachem contends the circuit court erred in concluding he did not make a report that qualified as protected activity, failed to establish causation, and failed to overcome the legitimate, nondiscriminatory reasons cited by defendants for his termination. There remained triable questions of material fact related to these issues, precluding summary disposition.

## A. PROTECTED ACTIVITY

Hachem contends the circuit court erred in determining he failed to create a triable question of fact that he was engaged in a protected activity. " 'Protected activity' under the WPA consists of (1) reporting to a public body a violation" or "suspected violation" "of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation." *Debano-Griffin v Lake Co*, 486 Mich 938, 938; 782 NW2d 502 (2010); *Chandler v Dowell Schlumberger Inc*, 456 Mich 395, 399; 572 NW2d 210 (1998). Defendants do not challenge their status as a public body to whom report of a violation or suspected violation could be made.

The term "report" is not defined in the WPA. In *Hays v Lutheran Soc Servs of Mich*, 300 Mich App 54, 59; 832 NW2d 433 (2013), this Court defined "report" consistent with *Random House Webster's College Dictionary* (2005), as: " 'a detailed account of an event, situation, etc., [usually] based on observation or inquiry.' " (Alteration in original.) "An employer is entitled to objective notice of a report or a threat to report by the whistleblower." *Roulston v Tendercare, Inc*, 239 Mich App 270, 279; 608 NW2d 525 (2000) (quotation marks and citations omitted). This means that the employer must be aware of the employee's protected activity.

Hachem spoke to Bazzi in either late July or early August of 2021. Hachem told Bazzi that his backyard was flooded for the first time and showed him a video and pictures. Hachem told Bazzi the flooding was caused by Saab's concrete "which . . . seemed to be pretty high." Although Hachem could not remember his exact words, he "believed" he "said it's against the ordinance of the City." Hachem's "belief" is bolstered by his remembrance of Bazzi's response: "[D]on't worry about ordinances. Worry about your department." Contrary to the circuit court's conclusion, this was sufficient to create a triable question of fact that a report was made. Bazzi's response supports that he objectively understood Hachem was reporting an ordinance violation causing flooding on his property. It is irrelevant at the summary disposition phase that Bazzi testified he remembers this conversation differently. The evidence must be viewed in Hachem's favor without attempting to resolve credibility contests.

Defendants argue that Saab's concrete did not violate any city ordinance. As there was no legal violation to report, defendants suggest Saab was not engaged in protected activity. This is not the test. The statute clearly includes protection for an employee reporting "a suspected violation of a law or regulation or rule." MCL 15.362. In any event, Saab's concrete work does appear to violate the city's ordinances. Dearborn Heights City Code, Art V, § 36-106 addresses "Dimensional Standards" pertaining to "District Regulations," and states that in the Residential 1

-7-

district, a maximum 35% of a lot may be covered, i.e., built upon or paved.  This includes a 25% limit for the front yard and 35% limit for the backyard.

Defendants also contend that Hachem did not engage in protected activity because his motivation was inconsistent with furthering the ends of the WPA.  However, the Supreme Court has rejected this position:

> Nothing in the statutory language of the WPA addresses the employee's motivation for engaging in protected conduct, nor does any language in the act mandate that the employee's primary motivation be a desire to inform the public of matters of public concern.  Rather, the plain language of MCL 15.362 controls, and we clarify that a plaintiff's motivation is not relevant to the issue whether a plaintiff has engaged in protected activity and that proof of primary motivation is not a prerequisite to bringing a claim.  To the extent that *Shallal* [*v Catholic Soc Servs*, 455 Mich 604; 566 NW2d 571 (1997),] has been interpreted to mandate those requirements, it is disavowed.  [*Whitman*, 493 Mich at 306.]

It does not matter whether Hachem was motivated to protect his entire neighborhood from encroaching floodwaters or simply by his dislike for Saab.  He reported a suspected violation of the Dearborn Heights city ordinances and he wanted the violation rectified.  This was sufficient.

## B.  CAUSATION

Hachem contends the circuit court erred in determining he failed to create a triable fact question regarding causation.  To prove causation, a plaintiff is required to present evidence of more than a mere coincidence in timing between the protected activity and the adverse employment action.  *Garg v Macomb Co Community Mental Health Servs*, 472 Mich 263, 286; 696 NW2d 646 (2005), amended 473 Mich 1205 (2005).  In *Rymal v Baergen*, 262 Mich App 274, 303; 686 NW2d 241 (2004), this Court explained: "A causal connection can be established through circumstantial evidence, such as close temporal proximity between the protected activity and adverse actions, as long as the evidence would enable a reasonable fact-finder to infer that an action had a discriminatory or retaliatory basis."

Hachem contended that almost immediately after reporting that Saab's concrete caused the runoff onto his property, Bazzi started "exhibit[ing] a hostile tone and demeanor toward" him, stopped taking his calls, refused meetings, undermined him with CEDD staff, and micromanaged his department.  This made it nearly impossible for him to do his work.  Defendants contend that this change in Bazzi's attitude and behavior is insufficient and that Hachem must cite a demotion, pay decrease, termination, or something to that effect.  This simply is not the standard.  If an employee reports a suspected violation of a law or rule and the employer reacts by ignoring the employee to the extent the employee cannot successfully perform their job, this is retaliation.  It affects the general conditions of employment.

Ultimately, Hachem does not contend that a temporal connection between his protected activity and termination, standing alone, supports the causation element.  Rather, he contends that Bazzi treated him with hostility following his report and through his termination.  Although Bazzi

denies mistreating Hachem in the interim, this again is a credibility contest between two versions of events.  This creates a triable question of fact for a jury to consider.

## C.  LEGITIMATE REASONS FOR TERMINATION OR PRETEXT

Finally, Hachem challenges the circuit court's conclusion that he failed to create a triable fact question regarding pretext.

> A plaintiff can establish that a defendant's articulated legitimate . . . reasons are pretexts (1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision.  [*Feick v Monroe Co*, 229 Mich App 335, 343; 582 NW2d 207 (1998).]

In the summary disposition context, this Court has observed:

> The granting of a motion for summary disposition is especially suspect where motive and intent are at issue or where a witness or deponent's credibility is crucial. Accordingly, where the truth of a material factual assertion of a moving party depends upon a deponent's credibility, there exists a genuine issue for the trier of fact and a motion for summary disposition should not be granted.  [*Vanguard Ins Co v Bolt*, 204 Mich App 271, 276; 514 NW2d 525 (1994) (citations omitted).]

When Bazzi terminated Hachem, he stated he was combining the grants and CEDD departments and needed only one director.  At his deposition, Bazzi described that he waited until after the general election to make this change because he wanted to "keep things intact until after the elections" because he had become mayor so suddenly.  As mayor, however, Bazzi knew he could choose new department heads and create his own "team."  Bazzi did not use the word "terminate," claiming he "unappointed" Hachem.  Bazzi added to his reasoning for "unappointing" Hachem as the case proceeded.  In answer to an interrogatory, defendants added that Bazzi made this decision, in part, "because [Hachem] was not meeting expectations of improving compliance with federal guidelines for use of grant funding."  Bazzi added at his deposition that he felt he could not trust Hachem because Hachem took a three-week vacation to Lebanon without proper approval, was arrested while overseas, and then was not forthcoming about the reason for his arrest.

The reasons cited by Bazzi would certainly form a legitimate, nondiscriminatory reason to support Hachem's termination or "unappointment."  However, Hachem presented evidence to challenge these reasons.  First, Hachem contends that Bazzi waited to terminate him until after the general election because he needed the support of Hachem and his allies to win.  Second, Hachem presented an undated letter from HUD congratulating him "on accomplishments made during the past year toward the achievement of departmental objectives," including "continued support" for the city's senior center serving 11,727 senior citizen residents, providing "building improvement funds to the Vista Maria Facility, which houses at-risk women and youth," and being in compliance with audit requirements for the period ending June 30, 2020.  Third, Hachem contended he secured approval for his vacation from Bazzi, but claimed that Bazzi (or someone acting on his direction) destroyed the meeting notes Hachem kept in a drawer in his office.  Hachem further claimed he entered the vacation into Paylocity (which someone from the mayor's office approved), and that

he was not arrested in Lebanon, only briefly detained at the airport, leaving nothing to report to his employer.  Fourth, as noted above, Hachem more than adequately supported his claim that Bazzi terminated him for bringing to light an ordinance violation committed by Saab that Bazzi helped orchestrate through underhanded means.

This evidence standing alone is sufficient to create a triable question of fact that the reasons cited by Bazzi for Hachem's termination were mere pretext.  Accordingly, we need not address Hachem's lengthy claim regarding Bazzi's other allegedly retaliatory actions.

Ultimately, Hachem presented sufficient evidence to overcome defendants' summary disposition motion and to send this matter to a jury.

We vacate and remand for continued proceedings.  We do not retain jurisdiction.


/s/ Christopher P. Yates
/s/ Stephen L. Borrello
/s/ Kristina Robinson Garrett

-10-

A-11

# AUTHORITY APPENDIX B

# FEDERAL DISTRICT COURT AUTHORITY AND RECORD

**Reyna v. Hart**

Case No. 2:23-cv-12790-CI, ECF No. 52

Eastern District of Michigan - October 9, 2025

Relevant authority concerning allegations of retaliation connected to speech at a City Council meeting:

The opinion describes deposition testimony and affidavits alleging retaliation against a Dearborn Heights employee following speech at a City Council meeting. The court denied leave to add the proposed retaliation claim on procedural grounds and did not adjudicate that claim on the merits. Plaintiff cites the opinion as notice to the City of prior retaliation allegations involving City Council speech.

Given Plaintiff's, Lucas's, and Gavin's testimony about retaliation for speaking at the city council meeting, it is difficult to credit Plaintiff when he says he could not have sought leave until Bazzy and Farhat came forward. Bazzy and Farhat did not add new information about Plaintiff's involvement in the city council meeting nor did they bring a new theory of retaliation out of that meeting. Plaintiff had the facts necessary to seek leave to amend based on that theory in March 2025, well before the close of discovery and the passing of the dispositive

70

B-1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH REYNA,                                      Case No. 23-12790
                          Plaintiff,

v.                                                 Curtis Ivy, Jr.
                                                   United States Magistrate Judge

JERROD HART and CITY OF
DEARBORN HEIGHTS,
                          Defendants.
_____/

## OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND DENYING MOTION TO AMEND

Plaintiff Joseph Reyna has been a police officer serving Dearborn Heights in varying capacities since March 2009. He suffered a heart attack in March 2021, that requires him to take blood thinner medication to avoid further heart issues or a stroke. Following the heart attack, he returned to work on light duty for a short time then returned to his position as the Accreditation Manager for the Department. This role was a desk job. Dearborn Heights later hired Defendant Jerrod Hart as the Police Chief during February 2022. Hart decided to pause the Department's accreditation efforts and notified Plaintiff in June that he would be reassigned to uniformed road patrol. Plaintiff showed Defendant a note from a cardiologist prohibiting Plaintiff from work that would expose him to physical danger, such as a gunshot wound, because of the risk of bleed while on blood thinners. Defendant


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

Hart determined that, because of Plaintiff's restriction, he could not work as a police officer. Hart placed him on paid administrative leave in June 2022.

Plaintiff sues the City of Dearborn Heights and Defendant Hart for disability discrimination in violation of the Americans with Disabilities Act ("ADA") and Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA").

Defendants moved for summary judgment. (ECF No. 36). After responding to that motion, Plaintiff moved for leave to amend the complaint a second time to add claims of retaliation under the ADA, PWDCRA, and First Amendment. (ECF No. 46).

The Court heard argument on both motions on October 8, 2025. For the reasons below, the motion for summary judgment is **GRANTED** and the motion to amend is **DENIED**.

A.     Disputed and Undisputed Facts

Plaintiff began his employment as a police officer in Dearborn Heights during March 2009 and attained the rank of sergeant in June 2017. (ECF No. 36-2, PageID.221, Plaintiff's Deposition). He worked in the Detective Bureau from his promotion until early 2020 when he became the Accreditation Manager. (*Id.* at PageID.242). This role was created in an effort to get the Police Department accredited in the State of Michigan. (*Id.* at PageID.657, 260). Accreditation is not

2

mandatory, but there are benefits associated with being an accredited police department. (ECF No. 36-6, PageID.632-33, Defendant Hart's Deposition).

On March 13, 2021, Plaintiff suffered a heart attack. Among other things, he started taking blood thinner medication. (ECF No. 38-1, PageID.852). After hospital treatment, Plaintiff began treating with cardiologist Dr. Gowman. Dr. Gowman issued a letter on Mach 23, 2021, stating that Plaintiff could return to light duty and desk work and that he would need to wear a defibrillator vest. (ECF No. 50, PageID.2199). Plaintiff told then-Police Chief Meyers about this restriction who said there would be no issue with Plaintiff continuing to work as the Accreditation Manager as that was a desk job. (ECF No. 36-2, PageID.285). On May 21, 2021, medical personnel cleared Plaintiff to work without restriction in a document Plaintiff provided the police department. (ECF No. 36-4, PageID.564, Janet Lucas (Administrative Assistant) Deposition); (ECF No. 36-2, PageID.282). Plaintiff continued working as the Accreditation Manager, but he had other cardiac episodes during September 2021, when he was diagnosed with atrial fibrillation, and in April 2022.[1] (ECF No. 38-1, PageID.846; 848).

---

[1] Plaintiff contends that Defendants aware are of the A-Fib diagnosis because he submitted medical documentation as they were created after his heart attack and return to work. There is no direct support in the record showing that Defendants were aware of the diagnosis. Indeed, Janet Lucas who worked in administration testified that she was unaware of any restrictions between September 2021 and June 2022. (ECF No. 38-6, PageID.1365). That said, there is a "return to work" document that notes the A-Fib diagnosis signed by a physician. (ECF No. 50, PageID.2201).

3

B-4

On February 28, 2022, Defendant Hart became the Chief of Police. Hart decided to pause the accreditation process because of compliance issues and shortcuts Plaintiff was taking. (*See* ECF No. 38-10, PageID.1433; ECF No. 51-1). Hart notified Plaintiff by letter on June 20, 2022, that he was being reassigned to the patrol division as Patrol Sergeant effective July 20, 2022. (ECF No. 38-9, PageID.1431). Plaintiff says that Hart told him about the reassignment before giving him the letter. During that conversation, Plaintiff said that his doctor does not want him on road patrol because of the blood thinners. Hart advised him to get corroborating documentation. (ECF No. 38-1, PageID.991). The day after the letter, Plaintiff gave Hart a note from Dr. Gowman. Dr. Gowman said that Plaintiff should not be placed in situations that could cause harm, "such as trauma, confrontation, or possibility of being shot." He invited the reader to contact his office if there were any questions or concerns. (ECF No. 36-3, PageID.546).

In Hart's July 7, 2022, notes about the reassignment, he wrote that Plaintiff told him his doctor did not want him in an assignment where he could be injured or shot because he was on blood thinners. (ECF No. 36-9, PageID.703). He added that Plaintiff "asked about an accommodation for his condition," and Hart directed him to human resources. (*Id.*). Based on Dr. Gowman's note, Hart thought Plaintiff could no longer perform the duties of a police officer. For instance, he noted concern about Plaintiff's habit of running up and down the stairs because if

4

he fell he might suffer a brain bleed. He contacted an MCOLES director who advised that Plaintiff's law enforcement authority should be suspended. (ECF No. 36-9, PageID.704). Hart looked at various department policies and discussed the matter with a captain and the Police Commissioner. He concluded that Plaintiff must be placed on non-punitive administrative leave. So on June 22, 2022, Hart suspended Plaintiff's law enforcement authority and took his weapon. (*Id.*; ECF No. 38-5, PageID.1316). On June 24, 2022, Hart asked a police captain to look at CCTV footage in the precinct to see if Plaintiff had been working out or running the stairs. Video showed Plaintiff doing so on June 21 and 22. Hart characterized his actions as "exposing the city to risk" based on the doctor's note. (ECF No. 36-9, PageID.705).

According to Plaintiff, Dr. Gowman "highly encouraged" him to exercise, including running the stairs at work. (ECF No. 38-1, PageID.985).

Dr. Gowman provided a revised letter dated July 12, 2022, which added that Plaintiff's restrictions would not change. (ECF No. 36-3, PageID.547).

No one reached out to Dr. Gowman's office with questions or for clarification.

Jordan Dottor was a sergeant and union president when Plaintiff was placed on administrative leave. He recalled talking to Defendant Hart about Plaintiff. He asked Hart whether the department could put Plaintiff "in an office." (ECF No.

5

38-13, PageID.1695). Hart disagreed; his concern was "if he gets a paper cut or something" because of the blood thinners. Dottor clarified that he could not recall if Hart specifically mentioned a paper cut or a cut more generally. (*Id.* at PageID.1695-96).

Plaintiff emailed Hart, Dottor, and others on February 13, 2023, asking for an update on his status. He wanted to know the City's plan for his employment and mentioned his request for "reasonable workplace accommodations as recommended by [his] cardiologist." (ECF No. 38-17). On March 16, 2023, Plaintiff reported to "First Choice" to see a physician chosen by the City for worker's compensation purposes. This purportedly did not address or assess an accommodation request.

During May 2023, Plaintiff took the promotional test for a lieutenant position. (ECF No. 36-2, PageID.337-38). He is the only person who passed that test (*id.* at PageID.338) so he is the only person who was on the list of those eligible for promotion (*id.* at PageID.340-41). Generally, when there is an opening, the person next on the list gets the promotion. But this list expires after two years. (*Id.* at PageID.342). Plaintiff was not promoted before the list expired.

Plaintiff is still on paid administrative leave with all the benefits he would have if he was actively working as a sergeant. (ECF No. 36-2, PageID.218).

B.      Summary Judgment

6

1. Governing Standards

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of material fact exists. . . ." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for purposes of the motion"). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Lee v. Metro.*

7

*Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citation omitted).

> 2.      Discussion

Plaintiff alleges that Defendants' conduct amounts to disparate treatment and failure to accommodate in violation of the ADA and comparable Michigan law. Michigan's PWDCRA "substantially mirrors the ADA, so resolving an ADA claim will generally resolve a plaintiff's PWDCRA claim." *Pemberton v. Bell's Brewery, Inc.*, 2025 WL 2539015, at *13 (6th Cir. Sept. 4, 2025) (citation omitted). So the Court will analyze the claims under the ADA.

The ADA prohibits discrimination against a qualified individual based on disability. 42 U.S.C. § 12112(a). "[N]ot making reasonable accommodations" is one form of discrimination. § 12112(b)(5)(A). ADA plaintiffs can prove discrimination with direct evidence or indirect evidence, each having its own analytical framework. Because of the different frameworks, it is "vital" to determine at the outset which test applies. *Blanchet v. Charter Comm., LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022). Claims based on an "employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to

8

accommodate) of discrimination." *Id.* (citation omitted). So the Court will apply the direct evidence test to the failure to accommodate claim.

Under the direct evidence test, Plaintiff has the burden of proving that (1) he is disabled and (2) is otherwise qualified for the job despite his disability "(a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation." *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018) (cleaned up). If Plaintiff meets his burden, then Defendants have the burden of "proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon" the department. *Blanchet*, 27 F.4th at 1228.

Plaintiff does not argue that he is qualified with an essential job function removed, so the Court will address whether he was otherwise qualified with or without a proposed reasonable accommodation.

Disparate treatment claims, on the other hand, are indirect evidence claims based on circumstantial evidence. "Such claims must be evaluated under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 619 (6th Cir. 2020). First, Plaintiff must establish that (1) he was disabled, (2) he was otherwise qualified for the job with or without

9

accommodation, (3) he suffered an adverse employment action, (4) the employer knew or had reason to know of the disability, and (5) similarly situated employees were treated more favorably. *Id.* If successful, the burden then shifts to Defendants to prove that there was a legitimate nondiscriminatory reason for taking the challenged employment action. If Defendants are successful, then the burden shifts back to Plaintiff to show that the proffered reason is pretextual. *Id.*

> a. Failure to Accommodate

Defendants focus their argument on whether Plaintiff was a qualified individual and whether he requested a reasonable accommodation.

For the second element, Plaintiff must show that he is a "qualified individual with a disability" by showing: (1) that he "satisfies the prerequisites for the position [he holds or desires], such as possessing the appropriate educational background, employment experience, [and] skills . . ."; and (2) that he "can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 256 (6th Cir. 2000) (citation omitted).

Defendants argue that Plaintiff was not qualified for any police position requiring an MCOLES license because he cannot perform the essential functions of the job if he is limited to working that would not place him at risk of "trauma, confrontation, or possibility of being shot." (ECF No. 36, PageID.192; ECF No.

10

36-3, 546)).  Plaintiff counters that he is a qualified individual because he could do the Accreditation Manager job without accommodation while on blood thinners, that he only needed an accommodation when reassigned to road patrol.  (ECF No. 38, PageID.765).

The evidence does not support that Plaintiff is a qualified individual with or without accommodation.  At the hearing and in the motion, counsel explained every position requiring an MCOLES certification, even a job working at the front desk, requires that the employee participate in emergent situations.  For instance, an officer working the front desk at the precinct would need to respond if a violent situation arose inside the lobby or in the parking lot.  Detectives, for example, must "run down leads, . . . come to crime scenes," which exposes the employee to risks of harm.  (ECF No. 43-3, PageID.2011).

Plaintiff attempts to rebut this by noting that Plaintiff was capable of working as an Accreditation Manager while on blood thinners, but he fails to note that during that period his physician (not Dr. Gowman) returned him to work "without restriction."  (ECF No. 36-4, PageID.564; ECF No. 36-2, PageID.282).  So as far as the Department was concerned, if an emergency arose, nothing would prohibit Plaintiff from assisting his co-workers.  But that changed when Dr. Gowman issued his note in June 2022 restricting Plaintiff's activities.

11

Plaintiff argues that Dr. Gowman's restrictions were not meant to preclude all police work because the restrictions were targeted only at patrol activities. (ECF No. 38, PageID.765). This interpretation of the letter does not have support in the record and fails to address the fact that an officer, sergeant, detective, or lieutenant may need to respond to an active, dangerous situation even when not on patrol.

What is more, Plaintiff testified that if he was in the precinct and there was an active shooter outside, he would respond even though he is on blood thinners because he would have a duty to respond. (ECF No. 36-3, PageID.442). Viewed from a different perspective, Plaintiff is acknowledging that his medication and Dr. Gowman's restrictions preclude him from assisting in an active shooter situation, but he would disregard the restrictions to assist. Since Plaintiff has not rebutted the evidence tending to show that any MCOLES-certified position requires the officer to assist in those kinds of situations, this is effectively Plaintiff's admission that he is not a qualified individual with or without an accommodator. Defendants also point out that Plaintiff began the application process for a police officer position in South Carolina during June 2022. He withdrew from consideration because of concern about his ability to perform the work considering his medical conditions and wanted to see what would happen with his health and if he would be "able to return to road status at some point." (ECF No. 36-10, PageID.715). Here, Plaintiff

12

is at least acknowledging that his medication precludes him from work outside the precinct.

This brings us to the issue of accommodations and whether a reasonable accommodation exists for Plaintiff to return to work. Plaintiff bears the initial burden of proposing accommodations and showing that they are objectively reasonable. *Kleiber v. Honda of Am. Mfg, Inc.*, 485 F.3d 862, 870 (6th Cir. 2007). Plaintiffs have flexibility in how they request an accommodation. *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 564 (6th Cir. 2022) (citation omitted). Still, "[f]or the purposes of a prima facie showing, the plaintiff must merely suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Cehrs v. Ne. Ohio Alzheimer's Rsch. Ctr.*, 155 F.3d 775, 781 (6th Cir. 1998) (citation omitted); *see also Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 419 (6th Cir. 2020) (quoting *Kleiber*, 485 F.3d at 870) ("Then, 'to overcome summary judgment, the plaintiff generally must identify the specific job he seeks and demonstrate that he is qualified for that position.'"). Once a request is made, the employer has a duty to determine whether there is a job the employee might be able to fill. *Burns*, 222 F.3d at 257. To do this, the employer must engage in an interactive process. *King*, 30 F.4th at 564. That said, the employer need not reassign the employee to a position for which he is unqualified, nor waive legitimate, nondiscriminatory policies, or displace other employees'

13

rights to consideration to accommodate a disabled individual. *Burns*, 222 F.3d at 257.

Defendants say that Plaintiff had the burden of suggesting an accommodation, but he never did. (ECF No. 36, PageD.195). Plaintiff says there are no magic words needed to request an accommodation, that Dr. Gowman's restrictions were enough to put Defendants on notice that he wanted or needed an accommodation. And his union representative, Jordan Dottor, suggested to Defendant Hart that perhaps Plaintiff could join the Detective Bureau. (ECF No. 38, PageID.768-70). Given this history, Plaintiff argues that Defendants failed to engage in the required "interactive process" to find a suitable accommodation and therefore violated the ADA. (*Id.* at PageID.772).

It is clear that Defendants were on notice that an accommodation was necessary for Plaintiff to return to work, if there was a reasonable accommodation, that is. But the Sixth Circuit requires more from plaintiff beyond merely suggesting the need for an accommodation; they must identify a job or an accommodation and show that they are qualified for the job or that the accommodation is objectively reasonable. It is this second step where Plaintiff's claim fails. As Defendants argue, Plaintiff did not suggest a particular accommodation or attempt to show that an accommodation was objectively reasonable, at least not until responding to their motion for summary judgment.

14

In response, Plaintiff asserts that he "expressed interest in returning to the Detective Bureau" when Defendant Hart first approached him about being reassigned to road patrol.  (ECF No. 38, PageID.755).  But that is not what he said at his deposition.  Plaintiff testified that Hart told him that Hart was reassigning him to road patrol and asked him if he came from the Detective Bureau before working as the Accreditation Manager.  (ECF No. 38-1, PageID.989).  Plaintiff did not testify that he expressed interest in returning to the Detective Bureau.

Plaintiff identified four jobs in his response brief that he says he could perform if placed in a non-patrol position—Detective Bureau Seargeant, Support Services Sergeant, Training Sergeant, and Administrative Lieutenant.  (ECF No. 38, PageID.767-68).  He did not present these positions to Defendants as reasonable accommodations before filing the lawsuit nor did he apply for them as vacancies were announced.  Employers do not have a duty to suggest accommodations to the employee in the first instance, nor do they have a duty to engage in the interactive process during litigation when the plaintiff suggests jobs or accommodations in response to a dispositive motion.

Even considering the four positions named in the response brief, the evidence does not make plain that Plaintiff could perform the essential functions while abiding Dr. Gowman's restrictions.

15

Plaintiff contends that he could have been on the Detective Bureau because he would not be exposed to dangers as much as he would on road patrol. (ECF No. 36-3, PageID.457-58). Yet Lieutenant Michael Guzowski said that whether a person is a road patrol sergeant or a detective sergeant, the person would have to do all the same duties any law enforcement officer might be required to do. (ECF No. 43-3, PageID.2009). Guzowski said that the detectives "run down leads, . . . come to crime scenes," for example. (*Id.* at PageID.2011). Dr. Gowman's restrictions would preclude Plaintiff from performing these tasks, and Plaintiff has not shown or suggested an accommodation that would be objectively reasonable.

In early 2025, Dr. Gowman answered some questions about Plaintiff's restrictions and specifically addressed the Support Services position. Dr. Gowman reaffirmed the restriction that Plaintiff should be in a position "that would keep him from being shot or injured since he is on blood thinners" and that he would at risk for bleeding if "exposed to injuries such as fighting or weapons." (ECF No. 38-19, PageID.1935, 1938). Dr. Gowman believed that Plaintiff should be back to work now in the Support Services position, one of the three positions Dr. Gowman was considering. (*Id.*). Dr. Gowman checked "unknown" for how long Plaintiff would be unable to perform the essential functions of the two other jobs, Road Patrol Sergeant and Detective Sergeant (this is perhaps a job within the Detective Bureau, addressed above).

16

Not only did Plaintiff not request to be considered for the Support Services job, (ECF No. 43, PageID.1996; ECF No. 36-3, PageID.447), but the position was filled before Dr. Gowman drafted his April 2025 letter, (ECF No. 43-5, PageID.2030).  And according to Defendant Hart, the person holding the Support Services role is required to go into the field, an activity that Dr. Gowman prohibits Plaintiff from engaging in.  (ECF No. 38-12, PageID.1512).  Lieutenant Guzman said the same thing—every position requires the ability to perform tasks that pose risks of harm.  Plaintiff did not present contrary evidence.  During the hearing, however, Plaintiff's counsel said that Dr. Gowman confirmed that Plaintiff could leave the precinct to assist in emergency situations, but Dr. Gowman did not appear to address emergency deployments.  (*See* ECF No. 38-19).

Plaintiff cited no evidence establishing the essential functions of a Training Sergeant, leaving a jury without a basis to find in his favor.  Here, too, the Court points back to Guzman's testimony that every position requires the ability to engage in tasks that pose a risk of harm.

Last is Administrative Lieutenant.  Plaintiff passed the promotional examination, so academically he was qualified to serve as a lieutenant.  In terms of physicality and exposure to risk, Plaintiff says this specific position was administrative and did not require patrol duties.  (ECF No. 38, PageID.768).  The job posting confirms that "the majority of the work will consist of internal

17

investigations." (ECF No. 38-22, PageID.1945). Yet among the list of other responsibilities is performing "all duties associated with a DHPD lieutenant." (*Id.*). Though not explicit in the materials the parties cite, presumably it is among their duties to assist in active shooter situations, or interview witnesses, or attend to the scene of a crime. These activities pose the kinds of risks Dr. Gowman wants Plaintiff to avoid. Plaintiff made no effort to show that there is an accommodation to this position that would allow him to have the job and that is objectively reasonable.

In all, there is no question of material fact as to whether Plaintiff was and is a qualified individual with or without a reasonable accommodation. Plaintiff's medical restriction as it currently stands precludes him from working as a police officer with MCOLES certification. Defendants are entitled to judgment on the failure-to-accommodate claims.

b. Disparate Treatment

As mentioned above, this claim requires Plaintiff to establish that (1) he was disabled, (2) he was otherwise qualified for the job with or without accommodation, (3) he suffered an adverse employment action, (4) the employer knew or had reason to know of the disability, and (5) similarly situated employees were treated more favorably. *O'Donnell*, 833 F. App'x at 619. If successful, the burden then shifts to Defendants to prove that there was a legitimate

18

nondiscriminatory reason for taking the challenged employment action. If Defendants are successful, then burden shifts back to Plaintiff to show that the proffered reason is pretextual. *Id.* "A failure to accommodate claim is separate and distinct from a discrimination claim, and is analyzed differently under the law." *Konieczka v. Rest Haven Illiana Christian Convalescent Home, Inc.*, 2019 WL 2191256, at *2 (N.D. Ind. May 20, 2019); *see also O'Donnell*, 833 F. App'x at 614 (distinguishing different standards used for failure to accommodate claims and disparate treatment claims); *Benitez v. Tyson Fresh Meats, Inc.*, 2022 WL 1283087, at *81 (M.D. Tenn. Apr. 28, 2022) ("To state [a disparate treatment claim] is not to state [a failure to accommodate or failure to engage in the interactive process claim].").

The parties argue two points—whether Plaintiff suffered an adverse employment action and whether he was treated differently from similarly situated employees.

Whether Plaintiff was treated differently from similarly situated employees is dispositive. Plaintiff contends that employees without disabilities were treated more favorably because he "was uniquely stripped of his license, excluded from communications, denied the interactive process, and subjected to hostile commentary from Hart – none of which happened to non-disabled employees." (ECF No. 38, PageID.775). This argument, however, is unsupported by evidence

19

and bears no connection to the complaint allegations about disparate treatment. Plaintiff alleged that he was treated differently because he did not get promoted to lieutenant despite passing the promotion examination.  (ECF No. 9, PageID.58-60). That allegation similarly lacks evidentiary support.  Indeed, there is no evidence that anyone was promoted to lieutenant since Plaintiff first went on leave.

Whether the claim is about not being promoted or about the actions asserted in the response brief, Plaintiff has not met his burden.  To show he was treated less favorably than non-disabled employees, he "must do more than make 'generalized and vague allegations' that another employee was treated better." *Stewart v. Esper*, 815 F. App'x 8, 17 (6th Cir. 2020) (citation omitted).  Plaintiff put forth no evidence that non-disabled employees have not had their licenses taken, or were excluded from communications, etc., or were promoted.  Even suggesting a hypothetical comparator would not have been enough.  *See Booker v. Bd. of Educ. of Toledo Sch. Dist.*, 2024 WL 5440984, at *2 (6th Cir. Dec. 12, 2024) (explaining that the plaintiff failed to establish a prima facie case of disability discrimination because "she did not identify any non-disabled . . . [employee] who received sick leave pay").  Plaintiff's arguments and assertions are far too generalized to meet his burden.  So Defendants are entitled to judgment on the disparate treatment claims.

C.     Motion to Amend

20

A little more than two weeks after responding to the motion for summary judgment, Plaintiff moved for leave to file a second amended complaint to add claims of retaliation in violation of the ADA and PWDCRA and in violation of the First Amendment. (ECF No. 46). He plans to allege that he was retaliated against for requesting a reasonable accommodation, for filing a charge of discrimination with the Equal Employment Opportunity Commission, and/or for opposing an act or practice made unlawful by the ADA or PWDCRA. (ECF No. 46-1, PageID.2092-94). He alleges that he was retaliated against in violation of the First Amendment for public comments he made at a Dearborn Heights City Council meeting on January 25, 2022. (*Id.* at PageID.2096).

Leave to amend the complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). That said, a motion for leave to amend a pleading "may be denied when the motion is the product of undue delay, bad faith, or dilatory motive, amendment would cause undue prejudice to the opposing party, the plaintiff repeatedly failed to cure deficiencies in the complaint with previous amendments, or amendment of the complaint would be futile." *Springs v. U.S. Dep't of Treasury*, 567 F. App'x 438, 443 (6th Cir. 2014) (citing *Riverview Health Inst. LLC v. Med. Mut. Of Ohio*, 601 F.3d 505, 520 (6th Cir. 2010)). "'A proposed amendment is futile if the amendment could not withstand a [Fed. R. Civ. P.] 12(b)(6) motion to dismiss.'" *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir.

21

2017) (quoting *Riverview Health*, 601 F.3d at 520). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (concluding that a plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action").

Because the motion was filed so late in the litigation, undue delay and prejudice are at the forefront of the Court's considerations. Ordinarily, delay alone is an insufficient reason for denying leave to amend. *See Tefft v. Seward*, 689 F.2d 637, 639 n.2 (6th Cir. 1982) ("Delay that is neither intended to harass nor causes any ascertainable prejudice is not a permissible reason, in and of itself to disallow an amendment of a pleading."). "At some point, however, delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party." *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002).

The Court finds Plaintiff's delay and the resulting prejudice too great to grant the motion. When Plaintiff was deposed in November 2024, he testified about when Defendant Hart put him on administrative leave. He said that the decision was Hart's decision, but also that Hart was the mayor's "puppet" who did

22

whatever the mayor told him and that Hart and the mayor jointly decided to put him on leave. (ECF No. 38-1, PageID.1011). Importantly, Plaintiff mentioned speaking at a city council meeting during January 2022 in favor of Hart's predecessor, suggesting that his leave could result from having spoken at the meeting. (*Id.* at PageID.1011-12). Given this testimony, Plaintiff's counsel said at the deposition that they intended to seek leave to amend the complaint to add retaliation claims. (ECF No. 36-3, PageID.531). That motion was not forthcoming.

During March 2025, Janet Lucas (administrative assistant at DHPD) and Lee Gavin (former DHPD Chief of Police) were deposed. Lucas testified that Hart removed the Accreditation Manager position in retaliation for Plaintiff's comments at the city council meeting. (ECF No. 38-6, PageID.1333). Gavin testified that Plaintiff was left on leave for as long as he was in retaliation for speaking at the city council meeting. (ECF No. 38-3, PageID.1255).

Then, in July 2025, two witnesses came forward to support the notion that Plaintiff was retaliated against. Sergeant Mohamad Bazzy says in his affidavit that Hart and others often discussed getting rid of Plaintiff by pushing him out after he spoke at the city council meeting and because of his work investigating Mr. Fawaz, a friend of the mayor's, who was accused of sexual contact with his daughter. (ECF No. 46-2). Former Interim Chief of Police Hussein Farhat says Plaintiff's

23

administrative leave was "handled with unusual scrutiny and hostility" because of the investigation into Fawaz. (ECF No. 46-3). Farhat was told that Plaintiff was racist. The retaliation Farhat referenced was letting the lieutenant promotion list expire without promoting Plaintiff.[2]

Because Bazzy and Farhat came forward only days before the motion was filed, and they could not have known about their potential testimony before they came forward, Plaintiff insists there was no undue delay. (ECF No. 46, pageID.2064). And without their affidavits, Plaintiff says he had no reasonable basis for his claims because Lucas and Gavin were not at the city council meeting. (*Id.* at PageID.2069). Thus, he argues that the motion to amend should be granted and a limited period of discovery should commence on the new claims.

Given Plaintiff's, Lucas's, and Gavin's testimony about retaliation for speaking at the city council meeting, it is difficult to credit Plaintiff when he says he could not have sought leave until Bazzy and Farhat came forward. Bazzy and Farhat did not add new information about Plaintiff's involvement in the city council meeting nor did they bring a new theory of retaliation out of that meeting. Plaintiff had the facts necessary to seek leave to amend based on that theory in March 2025, well before the close of discovery and the passing of the dispositive

---

[2] Plaintiff did allege retaliation based on his investigation into Fawaz. (*See* ECF No. 46-1, PageID.2091-99).

24

motion deadline, and had he done so, he could have spent the discovery period searching for evidence in support of the claim. At this point, the delay is undue.

Similarly, the notion that Plaintiff was placed on leave, stripped of his MCOLES license, and removed from department communications was retaliation for his disability cannot seriously be considered "new" and available only after Bazzy and Farhat came forward. Neither witness mentioned retaliation for anything related to Plaintiff's disability or EEOC charge. Plaintiff has had sufficient facts to amend his complaint to a claim for disability-related retaliation since the discovery period began.

The Court acknowledges Plaintiff's point that Bazzy and Farhat, and perhaps others, are afraid to come forward for fear of their own retaliation so they did not come forward until recently. That said, there simply was sufficient information to assert the claims since the onset of the litigation and time for discovery to learn more about the claims. Had Plaintiff or his counsel learned of a potential witness who was afraid of retaliation, there are tools available to protect those witnesses, such as protective orders or filing documents under seal (with the Court's leave to do so).

Not only did Plaintiff unduly delay in bringing the motion, Defendants will face significant prejudice if the motion is granted at this late stage. The case is nearly two years old. If granted, they will be required to engage in additional

25

discovery and additional motion practice all after a complete period of discovery was completed and after their motion for summary judgment was briefed, heard, and ruled on.  (ECF No. 47, PageID.2135).  It is unlikely that all of this and trial, if needed, will be completed before the case turns three years old.  Defendants have a legitimate and understandable interest in seeing the end to the lawsuit filed against them.

Granting leave would also place an unwarranted burden on the Court.  Just as it is prejudicial to Defendants to reopen discovery and create a new dispositive motion deadline now, it is prejudicial to the Court to grant summary judgment on the original claims but keep the litigation open to litigate new claims.  For these reasons, the motion is **DENIED**.[3]

**IT IS SO ORDERED**.


Date: October 9, 2025                          s/Curtis Ivy, Jr.
                                               Curtis Ivy, Jr.
                                               United States Magistrate Judge

---

[3] Given the undue delay and prejudice, the remaining factors including futility will not be addressed.

26

# AUTHORITY APPENDIX C

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

## Burgess v. Fischer

735 F.3d 462 (6th Cir. 2013)

No. 12-4191

Published Opinion - November 1, 2013

Sixth Circuit File Name: 13a0319p.06

**Relevant authority for municipal liability under Monell:**

The Sixth Circuit identifies four methods of proving an unlawful municipal policy or custom: an illegal official policy or enactment; ratification by an official with final decision-making authority; inadequate training or supervision; or a custom of tolerance or acquiescence toward federal-rights violations.

The opinion further explains the need for sufficiently similar prior misconduct under failure-to-train and custom-of-tolerance theories, and the limitations on single-act policymaker and after-the-fact ratification theories.

C-1

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0319p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

_____

LUCAS BURGESS; ANGELA BURGESS,

      *Plaintiffs-Appellants*,

     v.

Sheriff GENE FISCHER, in his individual and official capacity; THE BOARD OF COUNTY COMMISSIONERS OF GREENE COUNTY, OHIO; Maj. ERIC PRINDLE, Deputy JOSHUA E. BARRRETT, Deputy GLEN E. MCKINNEY, and Deputy MATTHEW C. SORTMAN, in their individual and official capacities; D. JORDAN, LPN,

      *Defendants-Appellees*.

No. 12-4191

> Appeal from the United States District Court
> for the Southern District of Ohio at Dayton.
> No. 3:10-cv-00024—Thomas M. Rose, District Judge.

Argued: July 30, 2013

Decided and Filed:  November 1, 2013

Before:  MOORE, CLAY, and WHITE, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Matthew C. Schultz, BRANNON & ASSOCIATES, Dayton, Ohio, for Appellants. Kevin A. Lantz, SURDYK, DOWD & TURNER CO., L.P.A., Miamisburg, Ohio, for Appellees.  **ON BRIEF:** Matthew C. Schultz, Dwight D. Brannon, BRANNON & ASSOCIATES, Dayton, Ohio, for Appellants.  Kevin A. Lantz, Edward J. Dowd, SURDYK, DOWD & TURNER CO., L.P.A., Miamisburg, Ohio, for Appellees.

No. 12-4191        *Burgess, et al. v. Fischer, et al.*                    Page 2

---

**OPINION**

---

CLAY, Circuit Judge.   Plaintiffs Lucas and Angela Burgess (collectively "Plaintiffs") appeal the summary judgment order that dismissed their excessive force, failure to intervene, deliberate indifference to a serious medical need, and municipal liability claims raised pursuant to 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments, as well as various state law claims, against Defendants.  The district court granted Defendants summary judgment on all claims on the basis of qualified immunity, state law immunity, or failure to set forth sufficient facts to establish a *prima facie* case.  Because we find that the right to be free from excessive force for pre-trial detainees in the booking process was clearly established under the Fourth Amendment at the time of this incident, we hold that the district court erred in failing to review the excessive force claim for reasonableness.  Upon considering the proper standard of liability, it is clear that material facts are still in dispute, and thus, the district court erred in granting summary judgment on this claim, as well as on the negligence, assault, battery, loss of consortium, intentional infliction of emotional distress, and spoliation of evidence claims under state law.

For the following reasons, we **REVERSE** in part the judgment of the district court granting Defendants summary judgment on Plaintiffs' § 1983 excessive force claim under the Fourth Amendment, as well as the state law claims of  negligence, assault, battery, loss of consortium, intentional infliction of emotional distress, and spoliation of evidence, **VACATE** the district court's grant of summary judgment on Plaintiffs' civil conspiracy claim, and **REMAND** for further proceedings consistent with this opinion; we **AFFIRM** with respect to all other claims on appeal.

No. 12-4191       *Burgess, et al. v. Fischer, et al.*                                    Page 3

## BACKGROUND

### A.       Factual Background

On January 23, 2009, Lucas Burgess ("Burgess") was pulled over by police for a routine traffic stop for speeding, but was found to be under the influence of alcohol and the prescription drug Paxil.  After failing several field sobriety tests, Burgess was placed under arrest for driving while intoxicated, in violation of Ohio Rev. Code § 4511.19.  He admits to being uncooperative with the arresting officer, Ohio State Highway Patrol Trooper David Griffith.  His resistance at the scene caused Griffith and his partner to perform a "takedown"—a tackle to the ground—on Burgess in order to subdue him and place him in handcuffs.  However, according to Burgess and Griffith, Burgess did not suffer any apparent injuries from the takedown at the scene.  Burgess' disruptive behavior continued while in transport to the Greene County Jail.  He was belligerent and yelled expletives at Griffith, who in turn forewarned officials at the jail that he was bringing in an irate arrestee for booking.

Several officials awaited Burgess' arrival, including the following defendants: Green County Deputy Sheriffs Joshua Barrett and Glen McKinney; Green County Corrections Officer Matthew Sortman; and Debbie Jordan, who worked as a nurse at the jail.  Upon his arrival, Burgess was handed over to Barrett and McKinney, who attempted to search his person some time shortly after 10:00 p.m. as part of the booking process.  At some point during the search, Barrett and McKinney performed a takedown on Burgess.

The parties dispute whether Burgess was noncompliant before the takedown and the effect the takedown had on Burgess.  According to Burgess, he was physically compliant and was not actively resisting the search, but was nonetheless knocked unconscious immediately after asking one of the officers, "while you're down there, you want to give me a blow job?"  (R.44, Am. Compl. ¶ 36; R.84, Burgess' Depo., PID# 1019.)  Griffith, who was still present at the time of the takedown, noticed that Burgess was bleeding from "the face or head area."  (R.86, Ex. 4, PID# 1573–74.)

C-4

No. 12-4191      *Burgess, et al. v. Fischer, et al.*                    Page 4

Burgess asserts that he did not awake until several hours later at around 2 or 3 a.m. with excruciating pain in his face and head, and a broken tooth.  He asked for medical attention, which Jordan provided.  She gave Burgess ibuprofen, and advised him that he merely had contusions but could request further medical attention if he wished to do so.

In contrast, Defendants assert that Burgess was irate and attempting to leave the mat area where the search was being conducted, and that he failed to comply with orders to stand still.  Burgess was warned that his continued noncompliance would result in a takedown.  Burgess did not heed the warning, and McKinney ordered the takedown after Burgess' "blow job" remark and continued physical resistance.  Defendants assert that the takedown lasted no more than ten seconds, and at no time was Burgess unconscious.  Jordan  assessed a conscious Burgess for injuries right after the takedown, and observed only "a small cut, bruising and some swelling in the vicinity of his left eye" and "a small amount of bruising and redness on his wrists and hands."   (R.87-4, Jordan Aff., PID# 1657.)  In her view, there were no injuries that warranted treatment or transport to a hospital, even when she again assessed Burgess' injuries later at his holding cell where he displayed a broken tooth.  Jordan provided him with ibuprofen, and Burgess made no further requests for medical attention by the time Jordan completed her shift at 12:45 a.m.  Burgess completed the booking process some time after 3:00 a.m.; and, according to Defendants, the prolonged process resulted from Burgess being combative and intoxicated rather than unconscious.

Neither party disputes that shortly after 3 a.m., Burgess completed a "Medical Screening Form," indicating that he had "no visible signs of trauma or illness," "no emergent illness or injury," and "no other medical/physical conditions of which the Jail should be aware."  (*Id.* at PID# 1658, 1660–64.)  Jordan signed the form when she returned for her next shift later that day.  Upon his release, however, Burgess admitted himself into a nearby hospital where CT scans  revealed that he had a "displaced left posterior lateral and inferior orbital wall fractures" and "moderate muscosal thickening of the left maxillary sinus from a displaced left anterior medial and posterolateral maxilla

No. 12-4191        *Burgess, et al. v. Fischer, et al.*                              Page 5

wall fractures." (R.85, Dr. Joseph Paris Depo., PID# 1274.) The fractures to Burgess' jaw and skull required surgery.

Despite his injuries, Burgess never contacted the Ohio State Highway Patrol or Greene County to complain or report the incident. Nonetheless, a routine internal investigation was conducted by the now-retired jail administrator, Defendant Major Eric Prindle, in accordance with police policy concerning any use of physical force. After speaking with the officials involved with the incident and reviewing their written reports, Prindle found that Barrett, McKinney, and Jordan followed the Green County Sheriff's policies regarding arrestee intake, medical screening, and the use of force. Sheriff Gene Fischer approved the investigation and its findings. The videotape evidence of the incident was destroyed pursuant to a five-day document retention policy.

## B.        Procedural History

In January 2010, Plaintiffs filed the instant action against Defendants Griffith, Barrett, McKinney, Sortman, Prindle, and Fischer, individually and in their official capacities; Jordan in her individual capacity; and the Greene County Board of Commissioners (hereinafter "Board").[1] They asserted constitutional claims for the use of excessive force, failure to intervene, denial of health care, violation of policies and procedures, and failure to train, supervise, and discipline under 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments. They also asserted numerous state law claims, including negligence, assault, battery, loss of consortium, intentional infliction of emotional distress, conspiracy to falsify reports, spoliation of evidence, medical negligence, and civil conspiracy. Defendants moved for summary judgment on all claims, while Plaintiffs moved for partial summary judgment on Defendants' asserted affirmative defenses. The district court granted Defendants' motion in full and found Plaintiffs' motion moot. The official capacity claims against the individual defendants

---

[1]Griffith was granted his motion to dismiss for lack of subject matter jurisdiction because the Eleventh Amendment bars the adjudication of pendent state law claims against non-consenting state defendants in federal court. *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 540–41 (2002); *see also Haynes v. Marshall*, 887 F.2d 700, 704 (6th Cir. 1989) (applying Ohio law). His dismissal is not challenged on appeal.

No. 12-4191        *Burgess, et al. v. Fischer, et al.*                                   Page 6

were dismissed as duplicative municipal liability claims, while the remaining claims were dismissed based on either qualified immunity, state law immunity, or failure to establish a *prima facie* case. *See Burgess v. Fischer*, 890 F. Supp. 2d 845 (S.D. Ohio 2012).  Plaintiffs timely appealed the judgment.

## DISCUSSION

### I.   Standard of Review

We review the district court's grant of summary judgment on qualified immunity grounds *de novo*.  *Simmonds v. Genesee Cnty.*, 682 F.3d 438, 444 (6th Cir. 2012).  A moving party is entitled to summary judgment if the pleadings, the discovery and the disclosure materials on file, and any affidavits "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  There is no genuine issue for trial where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  We must ultimately decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  In doing so, the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008).

### II.   Excessive Force

Plaintiffs assert that Barrett and McKinney used excessive force in performing the takedown on Burgess during the search at the jail, while Defendants contend that they are entitled to qualified immunity.  There is a long-standing principle that government officials are immune from civil liability under 42 U.S.C. § 1983 when performing discretionary duties so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Once raised, it is the plaintiff's burden to show that the defendants are not entitled to qualified immunity.

*Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).  To determine whether qualified immunity applies in a given case, we use a two-step analysis:  (1) viewing the facts in the light most favorable to the plaintiff, we determine whether the allegations give rise to a constitutional violation; and (2) we assess whether the right was clearly established at the time of the incident.  *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 786 (6th Cir. 2012); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001).  We can consider these steps in any order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### A.     Standard of Liability

This case presents an unusual circumstance where we must first determine under which constitutional amendment the right asserted was clearly established.  Section 1983 does not confer substantive rights; rather, it is only a means to vindicate rights already conferred by the Constitution or laws of the United States.  *Graham v. Connor*, 490 U.S. 386, 393–94 (1989).  Excessive force claims, however, can be raised under the Fourth, Eighth, and Fourteenth Amendments.  Which amendment should be applied depends on the status of the plaintiff at the time of the incident; that is, whether the plaintiff was a free citizen, convicted prisoner, or fit in some gray area in between the two.  *Lanman v. Hinson*, 529 F.3d 673, 680–81 (6th Cir. 2008); *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002).  The Fourth Amendment's prohibition against unreasonable seizures bars excessive force against free citizens, *see Graham*, 490 U.S. at 388, while the Eighth Amendment's ban on cruel and unusual punishment bars excessive force against convicted persons.  *See Whitley v. Albers*, 475 U.S. 312, 318–22 (1986).  When a citizen does not fall clearly within either category—e.g., pretrial detainees—the Fourteenth Amendment's more generally applicable Due Process Clause governs to bar a governmental official's excessive use of force.  *See Lanman*, 529 F.3d at 680–81; *Phelps*, 286 F.3d at 300.

A plaintiff has a substantially higher hurdle to overcome to make a showing of excessive force under the Fourteenth Amendment as opposed to under the Fourth Amendment.  *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001).  Under the Fourth Amendment, we apply an objective reasonableness test, looking to the

reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants. *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004); *see also Graham*, 490 U.S. at 396–97. We balance "the nature and quality of the intrusion on [a plaintiff's] Fourth Amendment interests against the countervailing governmental interests at stake." *Ciminillo v. Streicher*, 434 F.3d 461, 466–67 (6th Cir. 2006). In doing so, three factors guide our analysis: "'[(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (quoting *Graham*, 490 U.S. at 396). These factors are assessed from the perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight. *Graham*, 490 U.S. at 396–97.

In contrast, with a Fourteenth Amendment claim, we consider whether the defendant's conduct "shocks the conscience" so as to amount to an arbitrary exercise of governmental power. *Darrah*, 255 F.3d at 306 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46, 851–53 (1998)). This standard differs depending on the factual circumstances. *See id.* Where defendants are "afforded a reasonable opportunity to deliberate . . . their actions will be deemed conscience-shocking if they were taken with 'deliberate indifference' towards the plaintiff's federally protected rights." *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (citing *Lewis*, 523 U.S. at 851–52). If, however, the incident was a "rapidly evolving, fluid, and dangerous predicament," the plaintiff must show that the defendant acted "'maliciously and sadistically for the very purpose of causing harm' rather than 'in a good faith effort to maintain or restore discipline.'" *Id.* (quoting *Lewis*, 523 U.S. at 853).

Notwithstanding the Due Process Clause's broader applicability, we remain cognizant of the fact that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive

due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) (citing *Graham*, 490 U.S. at 394).

### B.        Clearly Established Right

In the instant case, the district court applied the "shocks the conscience" standard of the Fourteenth Amendment to find that there was no evidence that the deputies acted maliciously and sadistically. *See Burgess*, 890 F. Supp. 2d at 854–56. The district court found that the claim did not fall under the Fourth Amendment because the right to be free from excessive force as a pretrial detainee in the booking process was not clearly established until our decision in *Aldini v. Johnson*, 609 F.3d 858 (6th Cir. 2010), well after Burgess' arrest. *See Binay v. Bettendorf*, 601 F.3d 640, 646–47 (6th Cir. 2010) ("For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." (internal quotation marks omitted)). However, a review of our case law, including *Aldini*, compels the opposite conclusion, and we find that the district court erred in not applying the Fourth Amendment's reasonableness standard to the facts of this case.

In *Aldini*, the plaintiff was allegedly beaten and repeatedly tased by several officers in May 2006 while he was being held in the booking room pending completion of the booking process but after he had been surrendered to the jailers by his arresting officer. *Aldini*, 609 F.3d at 860–62. The same question was presented to the *Aldini* court—whether the Fourth or Fourteenth Amendment's standard of liability applied. We held that the Fourth Amendment's reasonableness standard governed the 2006 incident. *Id.* at 867. The *Aldini* court recognized that we had never addressed the precise question of "how far the Fourth Amendment's protection extended beyond the transfer of custody from the arresting office[r]s"; however, we noted that our precedent nonetheless established the broader understanding that the Fourth Amendment extends "at least through the completion of the booking procedure, which is typically handled by jailers." *Id.* at 865–66; *see also Phelps*, 286 F.3d at 300–01. And while our 2002 decision in *Phelps* could have been narrowly construed as clearly establishing the Fourth Amendment's protection only for individuals still in the custody of the arresting officer

No. 12-4191 *Burgess, et al. v. Fischer, et al.* Page 10

as opposed to the jailers, *see* 286 F.3d at 299–300, it was not required to be on all fours in order to form the basis for the clearly established right. *See Quigley v. Truoung Vinh Thai*, 707 F.3d 675, 684 (6th Cir. 2013).

To be sure, *Aldini* did set forth a new principle. The *Aldini* court clearly established in 2010 that the dividing line between the Fourth and Fourteenth Amendment zones of protection was the probable cause hearing for warrantless arrests. 609 F.3d at 867. However, the district court missed a critical point of the decision—it was already clearly established that the Fourth Amendment's reasonableness standard applied at least through the booking process. *See id*. at 865–66. Indeed, the court held that the Fourth Amendment's reasonableness standard applied to a set of facts arising in May 2006, over two-and-a-half years before Burgess' car was stopped on January 23, 2009. *See id.* at 866. Because it was a reversal, the *Aldini* decision necessarily held that the Fourth Amendment right was clearly established in 2006. Therefore, the right was no less established in January 2009 when Burgess was allegedly assaulted. Consequently, the district court erred in applying the Fourteenth Amendment's "shocks the conscience" standard rather than the Fourth Amendment's reasonableness standard.

### C.      Constitutional Violation

Defendants argue that despite the fact that the district court applied an incorrect legal standard, the error was harmless. We disagree. "[F]orce that does not shock the conscience may nevertheless be unreasonable under the Fourth Amendment." *Id.* at 867. In viewing the facts in the light most favorable to Plaintiffs, we believe this case is a clear example of that point. We consider the following reasonableness factors to assess Burgess' excessive force claim: the severity of his crime, whether he posed an immediate threat to the safety of McKinney, Barrett or others, and whether he was actively resisting arrest or attempting to evade arrest. *See Martin*, 712 F.3d at 958. In this case, there are factual disputes that are material to the reasonableness inquiry that preclude summary judgment for McKinney and Barrett—specifically, whether Burgess posed a threat or actively resisted arrest.

No. 12-4191       *Burgess, et al. v. Fischer, et al.*                    Page 11

Plaintiffs claim that at the time of the takedown, Burgess was handcuffed, surrounded by four jail officials, and compliant with the orders necessary to facilitate the search. He admits only that he made an offensive remark to the officers—the "blow job" comment—which precipitated the takedown that rendered him unconscious. On these facts, our case law overwhelmingly compels a finding that the takedown resulting in several fractures to Burgess' face and head was unreasonable and clearly established as being so. *See, e.g.*, *Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010) ("[S]triking a neutralized suspect who is secured by handcuffs is objectively unreasonable."); *Phelps*, 286 F.3d at 301; *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988) (asserting that there is no need for any force when a detainee is handcuffed, non-threatening, and not trying to flee); *cf. Grawey v. Drury*, 567 F.3d 302, 310–11 (6th Cir. 2009) (finding that the use of pepper spray on an individual who had surrendered to an arrest was unreasonable) (collecting cases). Burgess' remarks, no matter how crude, could not alone weigh these factors in Defendants' favor where he was handcuffed, surrounded by several officials, and not physically resistant. And the fact that Burgess was initially resistant at the scene of the traffic stop with Trooper Griffith does not weigh in Defendants' favor. *See Feemster v. Dehntjer*, 661 F.2d 87, 89 (8th Cir. 1981) ("No matter how difficult it is to apprehend a prisoner, the law does not permit officers to beat him once he is securely in custody.")

Defendants assert that Burgess was combative so as to impede the efforts to search him and, specifically, that he pulled away from the deputies and disobeyed multiple orders to keep his head on the mat. They further assert that the takedown occurred only after Burgess was fairly warned that his continued noncompliance would result in a takedown. Although the district court was able to bypass this factual dispute as non-determinative for its shocks-the-conscience assessment, we find that this factual dispute goes to the heart of the reasonableness assessment. In sum, the dispute of material facts bars resolution of the excessive force claims against McKinney and Barrett on qualified immunity grounds. *Huckaby v. Priest*, 636 F.3d 211, 216–17 (6th Cir. 2011). Therefore, we reverse the district court's order granting Barrett and McKinney summary judgment.

No. 12-4191        *Burgess, et al. v. Fischer, et al.*                                    Page 12

**III.     Failure to Intervene**

We now turn to the failure to intervene claim against Officer Sortman and Nurse Jordan.   As a general matter, Sortman's and Jordan's mere presence during the altercation, without a showing of some direct responsibility,  cannot suffice to subject them to liability.  *See Binay*, 601 F.3d at 650.  Since these defendants did not actively participate in the takedown, there must be a showing that they either supervised the deputies who did so or owed Burgess a duty of protection.  *See Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).  To maintain their claim that Sortman and Jordan owed Burgess a duty of care, Plaintiffs must show that these defendants "observed or had reason to know that excessive force would be or was being used" *and*  "had both the opportunity and the means to prevent the harm from occurring." *Id*.  Plaintiffs simply have not met their burden.

Although the district court found this claim failed because it dismissed the excessive force claim, we nonetheless affirm on alternate grounds.  *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 362 (6th Cir. 2012) ("Appellate courts reviewing summary judgment may affirm on any grounds supported by the record.").  Even assuming that the takedown amounted to excessive force, Plaintiffs have failed to establish that Sortman and Jordan had the "opportunity and means" to intervene to establish this claim.  That is, they failed to demonstrate that the incident lasted long enough for Sortman or Jordan to both perceive what was going on and intercede to stop it.  *See Durham v. Nu'man*, 97 F.3d 862, 868 (6th Cir. 1996); *see also Kowolonek v. Moore*, 463 F. App'x 531, 539 (6th Cir. 2012) (finding that the defendant did not have the opportunity to intervene given the rapid sequence of events and the minimal time necessary to use a taser); *Ontha v. Rutherford Cnty.*, *Tenn*., 222 F. App'x 498, 506 (6th Cir. 2007) (finding that six or seven seconds was insufficient time to compel intervention).  Plaintiffs have failed to meet their burden.

Plaintiffs assert that Sortman and Jordan were in a position to at least reduce the force with which Burgess' head struck the ground.  However, Plaintiffs do not contend that the takedown lasted any more than ten seconds.  Moreover, Plaintiffs do not suggest

that these defendants had reason to anticipate the takedown or its result.  Sortman and Jordan simply did not have the benefit of hindsight at the time of the incident.  On these facts, there was not enough time for Sortman or Jordan to both perceive the incident and intervene to assist Burgess.  Therefore, we affirm the district court's dismissal with respect to this claim.

## IV.    Deliberate Indifference

### A.    Legal Framework

We consider next Plaintiffs' deliberate indifference claim against Jordan for her alleged inadequate treatment of Burgess' injuries.  The deliberate indifference to serious medical needs of prisoners—e.g., the failure to respond to medical needs, intentional denial or delay of medical care, or intentional interference with a prescribed treatment—constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).  The Fourteenth Amendment's Due Process Clause governs such claims presented by pretrial detainees, but "are analyzed under the same rubric as Eighth Amendment claims brought by prisoners."  *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013).

We employ a two-prong test with objective and subjective components to assess such claims.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  First, we determine whether the plaintiff had a "'sufficiently serious' medical need" under the objective prong.  *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008).  A medical need is sufficiently serious if it has been diagnosed by a physician that has mandated treatment or it is so obvious that even a lay person would easily recognize the need for medical treatment.  *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004).  Second, we determine whether the defendant had a "'sufficiently culpable state of mind'" in denying medical care under the subjective prong.  *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (quoting *Farmer*, 511 U.S. at 834).  There must be a showing of more than mere negligence, but something less than specific intent to harm or knowledge that harm will result is required.  *See Farmer*, 511 U.S. at 835.  The defendant must have "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the

No. 12-4191          *Burgess, et al. v. Fischer, et al.*                    Page 14

existence of such needs." *Blackmore*, 390 F.3d at 896 (internal quotation marks omitted).

Where the plaintiff has received some medical treatment, "federal courts are generally

reluctant to second guess medical judgments and to constitutionalize claims which sound

in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). However,

it is possible for the treatment provided to be "so woefully inadequate as to amount to

no treatment at all." *Id.*; *accord Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir.

2011).

      **B.**      **Analysis**

      We agree with the district court's finding that Plaintiffs failed to establish either

prong of the deliberate indifference test. Plaintiffs do not assert that Burgess' facial and

head fractures were obvious to a lay person. Indeed, the record suggests that these

injuries were discovered only after CT scans were taken at the hospital. Burgess'

injuries thus were latent medical injuries, which require a showing that the delay in

treatment itself caused a serious medical injury. *See Napier v. Madison Cnty., Ky.*, 238

F.3d 739, 742 (6th Cir. 2001). Plaintiffs do not provide any such evidence. Plaintiffs'

counsel conceded at oral argument that there was no evidence that Burgess' injuries

were made worse by the delay in diagnosis. We explained in *Blackmore* that verifying

medical evidence of an exacerbated injury was necessary to establish the objective prong

for "minor maladies or non-obvious complaints of a serious need for medical care." *See*

390 F.3d at 898; *Napier*, 238 F.3d at 742. Plaintiffs claim only that Burgess endured

hours of pain, which is insufficient to establish his claim.

      Plaintiffs alternatively assert that they established the objective prong with the

after-the-fact medical diagnosis of Burgess' fractures at the hospital. This assertion is

incorrect. The ability to satisfy the objective prong with a showing that the injury was

diagnosed by a physician who mandated treatment necessarily contemplates the

diagnosis being made *before* the defendant's alleged deliberate indifference. Latent

injuries are generally diagnosed by a physician after the defendant's treatment or lack

thereof, giving the plaintiff notice of the injury and a basis for the claim. There would

be no need for *Napier*'s requirement of verifying medical evidence for latent injuries,

No. 12-4191        *Burgess, et al. v. Fischer, et al.*                                    Page 15

or the alternative option of showing that an injury was obvious to a lay person, if a *post hoc* diagnosis of the latent injuries would suffice to establish the objective prong.

Moreover, Plaintiffs have failed to establish the subjective prong: there is no evidence that Jordan knew of the need for further treatment or should have known as a result of the circumstances. Plaintiffs' medical expert asserted only that a licensed practical nurse faced with Burgess' bruises and scratches should have further inspected the injury and possibly could have discovered the fractures. The medical expert claimed that Jordan departed from the acceptable standard of care in conducting her evaluation of Burgess. However, even if true, this only supports a finding that Jordan was merely negligent, which is insufficient to state a deliberate indifference claim under § 1983. *See Weaver v. Shadoan*, 340 F.3d 398, 411 (6th Cir. 2003); *see also Farmer*, 511 U.S. at 835. Jordan assessed Burgess' injuries and noted that he had cuts, bruising, and swelling. She also provided him with ibuprofen for the discomfort and advised him to notify the medical department if he needed further treatment. The record suggests that Burgess' injuries appeared to be superficial, non-serious physical conditions, which generally do not warrant medical treatment. *See Blackmore*, 390 F.3d at 898. And there is no evidence that Jordan's treatment was woefully inadequate given the circumstances.

Finally, Plaintiffs take issue with the fact that there were discrepancies in the description of Burgess' injuries on the Medical Screening Form he completed during the booking process and Jordan's personal notes of his injuries.[2] However, any failure on Jordan's part to note her own observations on Burgess' form was, again, at best negligence. We do not believe this fact would alone permit an inference that she was deliberately indifferent under the subjective prong. In sum, Plaintiffs have failed to establish either prong of the deliberate indifference test and, thus, we affirm the district court's dismissal of this claim.

---

[2]It appears Plaintiffs originally pleaded this claim in connection with their separate state law claims for conspiracy to falsify reports and tampering with evidence in their complaint. However, they have abandoned those claims on appeal, having not presented any argument on them. *See Smith v. Henderson*, 376 F.3d 529, 533 (6th Cir. 2004). On appeal, the assertion arises only in connection with Plaintiffs' deliberate indifference claim and is treated accordingly.

No. 12-4191     *Burgess, et al. v. Fischer, et al.*                                        Page 16

### V.     *Monell* Liability

#### A.     Legal Framework

Plaintiffs' final federal claim is a municipal liability claim against the Greene County Board of Commissioners.  A plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following:  (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.  *See Thomas v. City of Chatanooga*, 398 F.3d 426, 429 (6th Cir. 2005).  A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  *Monell*, 436 U.S. at 694.

#### B.     Analysis

Plaintiffs attempt to establish their *Monell* claim in three of the four above-mentioned ways.  They claim that Defendants had a policy of failing to train and supervise deputies on excessive force and staff on proper medical treatment, Major Eric Prindle's inadequate investigation proved there was a custom of tolerance, and Sheriff Gene Fischer authorized the alleged illegal acts.  A failure-to-train claim, however, requires a showing of "'prior instances of unconstitutional conduct demonstrating that the [municipality] ha[d] ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'"  *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)).  Similarly, a custom-of-tolerance claim requires a showing that there was a pattern of inadequately investigating similar claims.  *See Thomas*, 398 F.3d at 433; *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989).  Plaintiffs fail to point to any evidence of a pattern for either.

No. 12-4191       *Burgess, et al. v. Fischer, et al.*                          Page 17

Plaintiffs have not set forth *any* facts that there were prior instances of similar misconduct so as to show that the Board was on notice that its training and supervision with respect to the use of force and medical treatment was deficient. *See Miller*, 606 F.3d at 255. And although Plaintiffs assert that Prindle should have done more in his investigation of the takedown and treatment provided to Burgess, as in *Thomas*, they simply have not demonstrated a pattern of inadequate investigation of similar claims as required. *See Thomas*, 398 F.3d at 433. Plaintiffs point to this Court's decision in *Leach v. Shelby County Sheriff*, to assert that the failure to investigate supports a municipal liability claim. 891 F.2d 1241 (6th Cir. 1989). However, the *Leach* court was equipped with evidence of several separate instances where the prison failed to investigate similar claims of prisoner mistreatment. *See id.* at 1247–48 (noting that the lower court found that "at least 14 other paraplegics had received similar deplorable treatment"). Plaintiffs have not shown the existence of any prior instances of a failure to investigate claims of excessive force.

Notwithstanding, a plaintiff would not need to establish a pattern of past misconduct where the actor was a policymaker with final policymaking authority. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–84 (1986) (plurality opinion); *see also Miller v. Calhoun Cnty.*, 408 F.3d 803, 816 (6th Cir. 2005). Plaintiffs attempt to establish *Monell* liability on a single-act theory, asserting that Sheriff Fischer's approval of the *post hoc* investigation by Prindle was sufficient for a finding that there was a unconstitutional policy by the Board. However, on a single-act theory, a plaintiff must demonstrate that a "deliberate choice to follow a course of action is made from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483. Moreover, that course of action must be shown to be the moving force behind or cause of the plaintiff's harm. *See id.* at 484–85 (finding *Monell* liability where the final decision maker ordered deputies to enter the plaintiff's medical clinic in violation of his Fourth Amendment right); *Moldowan v. City of Warren*, 578 F.3d 351, 394 & n.20 (6th Cir. 2009) (affirming denial of summary judgment on *Monell* claim where Plaintiff alleged that final

No. 12-4191          *Burgess, et al. v. Fischer, et al.*                    Page 18

policymaker directed the destruction of material evidence); *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1118 (6th Cir. 1994).

In the instant case, Fischer did not order the takedown, nor do Plaintiffs assert that a course of action selected by Fischer was the moving force behind Burgess' injury. Fischer's after-the-fact approval of the investigation, which did not itself cause or continue a harm against Burgess, was insufficient to establish the *Monell* claim. *Cf. Pembaur*, 475 U.S. at 481–84; *Moldowan*, 578 F.3d at 394 & n.20.  Such an outcome would effectively make the Board liable on the basis of *respondeat superior*, which is specifically prohibited by *Monell.*  436 U.S. at 694–95.  In sum, even assuming there was an underlying constitutional violation, we affirm the dismissal of the *Monell* claim because Plaintiffs have failed to set forth sufficient facts to establish an unconstitutional custom or policy.

## VI.    State Law Claims

We now turn to the pendent state law claims summarily dismissed by the district court.  As an initial matter, we note that employees of an Ohio political subdivision who act within their official duties are statutorily immune from suits in tort based on mere negligence.[3] *Anderson v. City of Massillon*, 983 N.E.2d 266, 271–72 (Ohio 2012).  To overcome this immunity, the alleged action or inaction must be committed "with malicious purpose, in bad faith, or in a wanton or reckless manner."  Ohio Rev. Code § 2744.03(A)(6)(b).  "'Malice' is the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified."  *Cook v. City of Cincinnati*, 658 N.E.2d 814, 821 (Ohio Ct. App. 1995). A defendant can be said to act in "bad faith" where it is shown that he acted with a "dishonest purpose," or "conscious wrongdoing," or he breached a "known duty through some ulterior motive or ill will."  *Id*.  "Wanton misconduct is the failure to exercise *any* care toward those to whom a duty of care is owed in circumstances in which there is

---

[3]The political subdivision is also immune from civil suit unless a statutory exception under Ohio Revised Code § 2744.02(B) applies.  However, Plaintiffs make no argument on appeal that a statutory exception applies to the Board—so that issue is not before us.

No. 12-4191        *Burgess, et al. v. Fischer, et al.*                        Page 19

great probability that harm will result." *Anderson*, 983 N.E.2d at 273 (emphasis added). And finally, "reckless conduct" is the "conscious disregard of or indifference to a known or obvious risk of harm . . . that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.*

### A.        Negligence, Assault, Battery and Loss of Consortium Claims

Plaintiffs assert that the takedown by Barrett and McKinney amounted to negligence, assault, and battery; and Angela Burgess advances a claim for loss of consortium.  The district court dismissed these claims, relying on its finding that the takedown was not unconstitutionally excessive.  However, because we find that there is a question as to whether Barrett's and McKinney's conduct was reasonable under the Fourth Amendment, we also find that upon viewing the facts in a light most favorable to Plaintiffs there is a question as to whether the conduct was reckless under § 2744.03(A)(6)(b). *See Harris v. City of Circleville*, 583 F.3d 356, 370 (6th Cir. 2009) (applying Ohio law).  On Plaintiffs' alleged facts, the handcuffed, intoxicated, and physically compliant Burgess was slammed to the ground by two deputies, resulting in serious facial and skull fractures.  Surely there is a question as to whether this conduct amounted to recklessness.  And because the loss of consortium claim is derivative of the negligence, assault, and battery claims, we find that this claim must also survive summary judgment. *See Bowen v. Kil-Kare, Inc.*, 585 N.E.2d 384, 392 (Ohio 1992).

### B.        Intentional Infliction of Emotional Distress

Plaintiffs assert a claim for intentional infliction of emotional distress arising out of Barrett's and McKinney's actions at the jail.  To establish a *prima facie* claim for intentional infliction of emotional distress, "a plaintiff must prove (1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of the plaintiff's serious emotional distress." *Phung v. Waste Mgmt., Inc.*, 644 N.E.2d 286, 289 (Ohio 1994).  Liability can only be found where conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community."  *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 453 N.E.2d 666, 671 (Ohio 1983) (quoting Restatement (Second) of Torts § 46 cmt. d), *abrogated on other grounds by Welling v. Weinfield*, 866 N.E.2d 1051, 1054 (Ohio 2007).  Based on the record before us, genuine issues of material fact preclude summary judgment on this claim in Defendants' favor.

According to Plaintiffs' version of the facts, Burgess physically cooperated with Barrett and McKinney while they searched him.  Burgess' sole transgression was to goad Barrett and McKinney by saying "while you're down there, you want to give me a blow job?"  Burgess testified that this comment made the officer searching him angry, and that officer "took [his] anger out on" Burgess. (R.84, Burgess Dep., PID# 1019.)  The next thing Burgess knew, he was waking up several hours later with facial lacerations and a broken tooth.  Were a jury to credit Plaintiffs' version of events, that jury could reasonably conclude that the officer who knocked Burgess out was intending to do more than hurt Burgess physically.  A reasonable jury could infer that an officer assaulted him with the intent to reprimand Burgess for this remark—that is, to humiliate him.  Under this version of the facts, one could conclude that an officer's assault of a compliant arrestee for an off-color jibe is utterly intolerable in a civilized community.  *Cf. Radcliff v. Steen Elec., Inc.*, 841 N.E.2d 794, 804 (Ohio Ct. App. 2005) ("That an employer might sanction [sexual pranks] in the workplace in retaliation for [a] rumored comment about [an employee's] sexual orientation is [] intolerable in a civilized community.").  Since Burgess' injuries were sufficiently severe so as to satisfy the third element of the prima facie case,[4] Plaintiffs are entitled to have a jury hear this claim.

## C.      Medical Negligence

Plaintiffs assert that the medical attention provided by Jordan amounted to medical negligence.  For a medical negligence claim, a plaintiff typically must show that the defendant breached an existing standard of care within the medical community, thus

---

[4] The district court found that Burgess had not presented sufficient evidence of "severe and debilitating" emotional distress; however, such evidence is not required where the plaintiff has suffered contemporaneous physical injury.  *See CitiMortgage, Inc. v. Hoge*, 962 N.E.2d 327, 334 (Ohio Ct. App. 2011) (citing *Paugh v. Hanks*, 451 N.E.2d 759, 765 (Ohio 1983)).

No. 12-4191          *Burgess, et al. v. Fischer, et al.*                    Page 21

causing his injury. *Bruno v. Tatsumi*, 346 N.E.2d 673, 677 (Ohio 1976). However, mere negligence is insufficient to overcome Jordan's immunity under Ohio Rev. Code § 2744.03(A)(6)(b), and Plaintiffs have failed to set forth sufficient facts that she acted in bad faith or in a malicious, reckless, or wanton manner.

Nurse Jordan tended to Burgess after the takedown and when he later requested aid from his holding cell. She assessed what she perceived to be minor injuries, provided him with ibuprofen for his pain, and advised him he could contact someone for further medical assistance if necessary. There is simply no evidence that Jordan intended to harm Burgess, acted with a dishonest purpose, or with indifference to a known or obvious harm. And what Plaintiffs' expert asserts was a departure from accepted standards of care in the medical community, i.e., negligence, is insufficient to overcome statutory immunity. Accordingly, we affirm the dismissal of this claim.

### D.    Spoliation of Evidence

Plaintiffs contend that when Defendants destroyed the videotape of the jail takedown, they committed a tort under Ohio law. The Ohio Supreme Court has recognized a free-standing cause of action for spoliation of evidence. *See Smith v. Howard Johnson Co.*, 615 N.E.2d 1037, 1038 (Ohio 1993). The elements of a claim for spoliation are: "(1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts." *Id.* On appeal, Defendants contend that Plaintiffs have not established the second or third elements of this claim. The record, however, reveals a genuine issue of fact both as to whether Defendants knew that litigation was probable and whether the destruction was willful.

As to the second element, Defendants assert that they neither knew nor should have known that litigation was probable at the time the tape was destroyed—just a few days after the events at the jail. Defendants claim that the tape was destroyed this soon after those events under a County policy that requires these tapes to be retained for only

No. 12-4191          *Burgess, et al. v. Fischer, et al.*                    Page 22

five days.  We have no occasion here to judge whether this document retention schedule runs afoul of Ohio public policy.[5]  We only note that since the County has adopted this schedule, purportedly for its own benefit, it should expect that this Court will consider the schedule as part of the totality of the circumstances in this case.  Here, the combination of the County's own policy with the alleged severity of the takedown preclude summary judgment on the second element of Plaintiffs' spoliation claim.

According to Plaintiffs' version of the facts, Burgess was the victim of an intentional assault in the jail that night.  If "the threat of pending litigation seems possible as a result of any accident," *Nye v. CSX Transp., Inc.*, 437 F.3d 556, 569 (6th Cir. 2006) (applying Ohio law), conduct that goes well beyond an accident makes litigation even more likely.  *See also Maynard v. Jackson County Ohio*, 706 F. Supp. 2d 817, 829 (S.D. Ohio 2010) ("[C]ourts have held that immediately after a motor vehicle accident occurs, reasonable people can anticipate that a lawsuit may be filed.").  Perhaps the takedown alone would not be sufficient to place Defendants on notice of probable litigation if they had waited weeks or months to destroy the tape.  But where the countdown to destruction is so brief, and the alleged conduct so serious, a reasonable jury could conclude that Defendants knew or should have known that litigation was probable when the tape was destroyed.

Defendants claim that even if they knew of probable litigation when they destroyed the tape, that destruction was not willfully designed to disrupt Plaintiffs' case.  "In a spoliation case, 'willful' reflects an intentional and wrongful commission of the act."  *White v. Ford Motor Co.*, 755 N.E.2d 954, 957 (Ohio Ct. App. 2001); *see also Owca v. Fed. Ins. Co.*, 95 F. App'x 742, 745 (6th Cir. 2004).  Defendants assert that they did not act with this intent—they simply followed the County's document retention schedule.  This argument fails for two reasons.  First, the document retention schedule does not demand, and may proscribe, destroying tapes such as these so soon after the

---

[5]We do note, however, that a five-day document retention policy seems patently unreasonable. Such a policy bars review of the evidence by anyone (including the County's own officials who may want to review the internal investigation).  The policy appears to be unreasonable, particularly in contrast to the fact that the Ohio State Highway Patrol apparently preserves its videos long enough to be of use to litigants in Plaintiffs' position.

events captured.  The policy applies to "[t]apes of jail areas (may include disturbances), and tapes from patrol cars' in-car cameras," and provides that "[t]apes may be erased and reused after five days."  (R. 87-7, Fischer Aff., Ex 6-4, at PID# 1789.)  Thus by its own terms, the policy does not require that tapes be destroyed after five days.  Defendants cannot therefore point to the policy and assert that destruction was compulsory.  In addition, the policy appears to exclude tapes such as the one relevant to this case—if a jury credits Plaintiffs' narrative, the tape depicted more than a mere "disturbance."  The policy, then, does not provide the blanket excuse Defendants seek.

Second, and more importantly, Defendants admit to violating their own policy. In support of Defendants' motion for summary judgment, the Greene County sheriff stated under oath that "[a]ny video of Mr. Burgess' intake and booking would have been erased *within* five (5) days of its recording" pursuant to the County's document-retention policy.  (R. 87-7, Fischer Aff., PID# 1712, ¶ 13 (emphasis added).)  The sheriff's affidavit shows that he either does not understand the County policy or consciously violates it.  The document retention schedule clearly requires that videotapes be retained for five days—not destroyed within that time.  In the end, the County's own policy and Defendants' own testimony create a genuine issue of fact concerning their willfulness in destroying the tape.  A jury will have the final word on this claim.

### E.      Civil Conspiracy

Under Ohio law, a claim for civil conspiracy requires "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995) (internal quotation marks omitted).  "A civil conspiracy claim is derivative and cannot be maintained absent an underlying tort that is actionable without the conspiracy." *Morrow v. Reminger & Reminger Co., L.P.A.*, 915 N.E.2d 696, 711–12 (Ohio Ct. App. 2009).  The district court dismissed this claim since it concluded that summary judgment was appropriate on Plaintiffs' spoliation cause of action—a decision we reverse.

In the alternative, Defendants argue that we should dismiss Plaintiffs' conspiracy claim pursuant to the intracorporate conspiracy doctrine.  This doctrine provides that "members of the same legal entity cannot conspire with one another as long as their alleged acts were within the scope of their employment." *Jackson v. City of Columbus*, 194 F.3d 737, 753 (6th Cir. 1999), *abrogated on other grounds by Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002).  Because this issue was scantly briefed by the parties and raises several novel issues of Ohio law, we decline to rule on the issue at this time. The district court may address the parties' arguments in the first instance on remand.

## CONCLUSION

For the foregoing reasons, we **REVERSE** in part the judgment of the district court granting Defendants summary judgment on Plaintiffs' § 1983 excessive force claim under the Fourth Amendment, as well as the state law claims of negligence, assault, battery, loss of consortium, intentional infliction of emotional distress, and spoliation of evidence, **VACATE** the judgment as it concerns Plaintiffs' civil conspiracy claim, and **REMAND** for further proceedings consistent with this opinion;   we **AFFIRM** with respect to all other claims on appeal.

# AUTHORITY APPENDIX D

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

### Darbi Boddy v. Mary Grech

No. 25-3490

Published Opinion - June 10, 2026

2026 WL 1678609

**Relevant authority cited for the public-comment and retaliation issues:**

The Sixth Circuit held that criticism of public officials remains protected during a limited-public-forum public-comment period, even when the criticism is sharp or personally directed. The court further held that officials may not silence the recognized speaker merely because listeners react disruptively.

The decision is relevant because Plaintiff alleges that he was the recognized speaker, raised a matter of public concern, did not materially disrupt the meeting, and was prevented from completing his remarks while the same subject was later addressed by City officials.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0164p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

DARBI BODDY,

     *Plaintiff-Appellant*,

    *v.*

MARY GRECH, individually and in her official capacity as President of the Board of Education of the Xenia Community City School District; XENIA COMMUNITY SCHOOLS BOARD OF EDUCATION,

    *Defendants-Appellees*.

No. 25-3490

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Dayton.
No. 3:24-cv-00327—Michael J. Newman, District Judge.

Argued:  March 19, 2026

Decided and Filed:  June 10, 2026

Before:  GRIFFIN, BUSH, and NALBANDIAN, Circuit Judges.

─────────────────

#### COUNSEL

**ARGUED:**  Curt C. Hartman, THE LAW FIRM OF CURT C. HARTMAN, Cincinnati, Ohio, for Appellant.  Bernard W. Wharton, MCCASLIN, IMBUS & MCCASLIN, Cincinnati, Ohio, for Appellees.  **ON BRIEF:**  Curt C. Hartman, THE LAW FIRM OF CURT C. HARTMAN, Cincinnati, Ohio, Christopher P. Finney, FINNEY LAW FIRM LLC, Cincinnati, Ohio, for Appellant.  Bernard W. Wharton, MCCASLIN, IMBUS & MCCASLIN, Cincinnati, Ohio, for Appellees.

    GRIFFIN, J., delivered the opinion of the court in which BUSH and NALBANDIAN, JJ., concurred.  BUSH, J. (pp. 16–22), delivered a separate concurring opinion.

————————————

**OPINION**

————————————

GRIFFIN, Circuit Judge.

During a public comment period of a Xenia School Board meeting, plaintiff Darbi Boddy attempted to express her views regarding the school district's alleged teaching of critical race theory.  In prepared remarks, delivered in a calm and deliberate manner, Boddy took issue with the "cowardice" of the school district's superintendent and characterized the Board as "failing." Displeased with the speech, Board president Mary Grech threatened to turn off Boddy's microphone.  Forty seconds later, as some in the audience became disruptive in reaction to Boddy's remarks, defendant Grech abruptly seized Boddy's microphone and recessed the meeting.  Boddy was denied her allotted five minutes of public comment, and she was not offered any additional time to address the Board when the meeting resumed.

Boddy brought this action seeking vindication of her First Amendment rights.  The district court denied Boddy's motion for a preliminary injunction, ruling that she had failed to demonstrate a strong likelihood of success on the merits or irreparable harm.  We disagree. Accordingly, we reverse and remand for the entry of a preliminary injunction in Boddy's favor.

I.

Defendant Xenia Community Schools Board of Education (the Board) governs the school district for Xenia, Ohio.  Mary Grech is one of five members of the Board and sits as Board president.  Gabriel Lofton serves as the superintendent for the school district.  Jeremy Cox was elected to the Board in 2023; since then, he has advocated for an audit of the district's alleged teaching of critical race theory to students.

On October 9, 2024, superintendent Lofton emailed a letter to members of the community, voicing his opposition to Cox's continual efforts toward auditing the district's curriculum.  The letter said, "To be entirely clear, Critical Race Theory is not being taught now, and has not been taught in the past."  His letter explained Cox's persistence, the school's efforts

to quell the inquiry, and that the issue would be placed on the agenda for the October 14 board meeting.

The October 14 board meeting was well attended, and some attendees recorded the meeting. Some members of the public, including Boddy, attended in support of Cox. Others supported Lofton. When it came time for Boddy to speak, she addressed the Board calmly and deliberately:

> My name is Darbi Boddy and I live in West Chester. I am a previous Board of Education member for the Lakota School District; I am on the board of Protect Ohio Children and represent the southern part of Ohio and the organization responsible for the heat map. I am also a leader for Moms for America in Butler County. I recently heard about the failing Xenia Board of Education and the cowardice [sic] superintendent who cannot perform adequately in his role . . . .

After speaking for only twenty-eight seconds, president Grech interrupted Boddy, shouting "Excuse me!" Boddy, however, continued. Quickly, Grech again yelled, "Ma'am, excuse me I will cut your mic." Undeterred, Boddy continued to methodically read from her prepared remarks:

> This superintendent reprimanded the one good board member who was doing [his] due diligence and asking questions so he could better understand the teaching environment, make educated decisions to determine what is best for the students of Xenia and therefore help create an educational environment free of racism and division, as is his job per ORC and school policy. It appears quite obvious this board and superintendent do not advocate for transparency and want to continue pushing racist and divisive ideologies to the children of Xenia and indoctrinate them into an anti-American agenda . . . .

At this point, some in the crowd began to heckle Boddy with loud boos, which continued for approximately fifteen seconds.

About a minute and twenty seconds into Boddy's remarks and amid loud boos, Grech moved to recess the meeting, which another Board member quickly seconded. Yet Boddy continued to speak. A few seconds later, Grech walked up to the podium and took the microphone away as Boddy was speaking. Some in the crowd cheered; others jeered and booed. Boddy continued speaking, without a mic, as the Board shuffled out of the room.

Although Boddy was prevented from using her allotted five minutes of public comment, the Board did not offer Boddy any additional time to finish her remarks after the recess.

Boddy sued the Board and Grech under 42 U.S.C. § 1983, asserting a First Amendment claim. She moved to preliminarily enjoin the Board from enforcing its policy against her speech at future meetings. The district court held a hearing and heard testimony from Boddy, superintendent Lofton, and president Grech.

Board Policy 0169.1 governs public participation at Xenia's school board meetings. On its face, the policy applies "to all speakers and does not discriminate based on the identity of the speaker, content of the speech, or viewpoint of the speaker," and the policy is designed to keep meetings "productive and efficient." The policy empowers the presiding officer (here, Grech) to regulate the meetings with several basic rules: (1) each speaker is limited to a five-minute period unless extended by the presiding officer; (2) "[a]ll statements shall be directed to the presiding officer; no person may address or question Board members individually"; and (3) the participation portion of the meeting is not meant to be an interactive exchange between the Board and the public.

Policy 0169.1 also provides that the presiding officer may (1) "interrupt, warn or terminate a participant's session when they make comments that are repetitive, obscene, and/or comments that constitute a true threat (i.e., statements meant to frighten or intimidate one [] or more specified persons into believing that they will be seriously harmed by the speaker or someone acting at the speaker's behest)"; (2) "request any individual to stop speaking and/or leave the meeting when that person does not observe reasonable decorum or is disruptive to the conduct and/or orderly progress of the meeting"; (3) request law enforcement to remove a disorderly person; (4) "call for a recess or an adjournment to another time when the lack of public decorum so interferes with the orderly conduct of the meeting as to warrant such action"; and (5) "waive these rules with the approval of the Board."

At the preliminary injunction hearing, Boddy testified that she believed her statements were appropriately directed to the entire Board, not individual members. She acknowledged that she expressed "strong disapproval" of the Board but that she was also "calm" and abiding by the

decorum rule.  She acknowledged that other individuals, who also supported Cox's proposed curriculum audit, were able to speak at the meeting without disruption.  But this was only after Grech took the microphone away from her and after the recess.

Grech offered several reasons for curtailing Boddy's speech.  First, Grech stated that she did so because Boddy "was starting down the path of calling [people] names."  Next, Grech thought Boddy directed language "strictly to the [s]uperintendent," which she claims violated the Board's rules of decorum and amounted to "just inciting the crowd basically."  But Grech conceded that her threat to cut Boddy's microphone may have helped "rile up" the audience. She also testified that in her view, criticism of the Board and superintendent was not a "school matter."  Grech also took issue with Boddy's "tone" and "how she was talking."  Specifically, Grech thought that Boddy was focusing on the superintendent and not making eye contact with the Board as she spoke.  Later, however, Grech conceded that Boddy mostly read from her prepared speech, which necessitated looking down, and acknowledged that Boddy was not speaking directly at superintendent Lofton while she read.  According to Grech, she prevented Boddy from speaking not because of her views, but because Boddy was calling people "names" and spreading "baseless accusations."

In defense of her actions, Grech noted that she admonished another speaker at the Board meeting, Amber Boddie, who spoke in support of the superintendent.[1]  Grech chided Amber Boddie for not addressing the entire Board, just superintendent Lofton, but never took the microphone from her.

Boddy testified that—despite her desire to speak again—she felt "threatened" and "a little frightened" about speaking at a Xenia Board meeting without court intervention.  She also suggested that if she were to speak again, she would want to criticize the Board and its members and use "names or epitaphs [sic] such as tyrant."

After the hearing, the district court acknowledged that Boddy's criticism of the Board in the limited public forum was indeed subject to some First Amendment protection.  But the district court characterized some of her speech, particularly the phrase "cowardice [sic]

---

[1]To avoid confusion with plaintiff Boddy, we will refer to Amber Boddie by her full name.

superintendent," as an ad hominem attack unprotected by the First Amendment.  On whether Grech's regulation of Boddy's speech was reasonable, the district court found a factual roadblock.  It explained that Boddy failed to show success on the merits because the record "at times favor[ed] Plaintiff . . . and at other times favor[ed] Defendants."  Based on the testimony, the district court found that Grech's initial interjection appeared to escalate the crowd's response to Boddy's speech—"some members of the public began to speak out" "slightly after" Grech interrupted Boddy.  On Boddy's heckler's veto theory, the district court held it was too close to decide because of Grech's apparent mixed motives.  Regarding irreparable harm, the district court found Boddy's evidence insufficient.  The district court did not address the last two preliminary injunction factors.

In the end, the district court denied Boddy's motion for a preliminary injunction because it concluded that Boddy failed to show a likelihood of success on the merits and irreparable harm.  Boddy appealed.

## II.

"We review a district court's legal conclusions de novo, its factual findings for clear error, and its ultimate decision to grant or deny preliminary relief for abuse of discretion."  *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017).  Although we independently apply the Constitution, we defer to the district court's overall balancing of the preliminary-injunction factors.  *Planet Aid v. City of St. Johns*, 782 F.3d 318, 323 (6th Cir. 2015).  For our preliminary injunction analysis, we consider: "(1) whether the movant has demonstrated a strong likelihood of success on the merits; (2) whether he would suffer irreparable injury without the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether issuing the injunction would serve the public interest."  *Doe*, 872 F.3d at 399 (citing *Planet Aid*, 782 F.3d at 323).  "A preliminary injunction is an extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation modified), one that should "only be awarded upon a clear showing that the [party] is entitled to such relief," *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).

No. 25-3490                          *Boddy v. Grech, et al.*                          Page 7

## III.

When a case turns on a potential constitutional violation, "the likelihood of success on the merits often will be the determinative factor." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam) (citation modified). To show a strong likelihood of success on the merits, Boddy must show "more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997). At the same time, she "is not required to prove [her] case in full." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citation modified).

Boddy advances two merits arguments: (1) defendants exercised viewpoint discrimination and (2) defendants ratified a heckler's veto. To defeat these claims, the Board and Grech rely on the Board's policies, Grech's admonishment of a speaker with views opposite Boddy's, and the need to maintain decorum at its school board meetings.

## A.

The First Amendment provides, "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. To determine the constitutionality of the government's restriction of speech, we assess (1) whether the speech is protected under the First Amendment, (2) the forum at issue, and (3) whether the regulation comports with the constitutional safeguards associated with that forum. *S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, 499 F.3d 553, 559 (6th Cir. 2007) (citing *Parks v. City of Columbus*, 395 F.3d 643, 647 (6th Cir. 2005)). The parties agree, and our precedent holds, that a school board meeting is a "limited public forum." *Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 432 (6th Cir. 2009) (citation modified). "In a limited public forum, the government can impose reasonable restrictions based on speech content, but it cannot engage in viewpoint discrimination." *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 519 (6th Cir. 2019).

Boddy argues that her speech—particularly the descriptors "failing" and "cowardice"—are protected by the First Amendment, even in a limited public forum. Thus, Boddy contends Grech engaged in viewpoint discrimination when she stifled her speech. We agree.

1.

We begin with whether Boddy's speech is protected by the First Amendment.  Boddy's speech criticized most of the Board as well as superintendent Lofton.  Boddy described the Board as "failing" and used "cowardice" to describe the actions of superintendent Lofton.

The Supreme Court has recognized distinct categories of speech that are traditionally not entitled to First Amendment protection.  *See e.g.*, *New York v. Ferber*, 458 U.S. 747, 765–66 (1982) (child pornography); *Roth v. United States*, 354 U.S. 476, 481 (1957) (obscenity); *Beauharnais v. Illinois*, 343 U.S. 250, 266 (1952) (defamation); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (fighting words).  But outside of these narrow exceptions, the First Amendment protects a person's speech.  *See Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026); *Bible Believers v. Wayne County*, 805 F.3d 228, 243 (6th Cir. 2015) (en banc) ("The First Amendment offers sweeping protection that allows all manner of speech to enter the marketplace of ideas.").

Boddy's speech does not fall into any of these unprotected categories.  Boddy's use of "failing" and "cowardice" do not constitute fighting words.  *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 409 (1989) ("No reasonable onlooker would have regarded Johnson's generalized expression of dissatisfaction with the policies of the Federal Government as a direct personal insult or an invitation to exchange fisticuffs."); *Greene v. Barber*, 310 F.3d 889, 896 (6th Cir. 2002) (explaining the "fighting words" doctrine is narrow).  Nor was her speech obscene, as it did not appeal to a "shameful or morbid interest in sex." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985) (citing *Roth*, 354 U.S. at 487 n.20).  She did not utter any "threatening, profane or obscene revilings" either. *Chaplinsky*, 315 U.S. at 573.  Boddy criticized the Board and the superintendent for their policy decisions, all while maintaining a calm demeanor and tone.

And even if Boddy's speech was offensive, the First Amendment protects this kind of speech.  *Bible Believers*, 805 F.3d at 243 (collecting cases).  A contrary rule would permit "a majority to silence dissidents," *Cohen v. California*, 403 U.S. 15, 21 (1971), and allow the government to ban "the expression of unpopular views," *id.* at 26.  But the Court's precedents

are clear: the government's regulation of offensive speech may constitute viewpoint discrimination.  *See Matal v. Tam*, 582 U.S. 218, 243 (2017) (plurality opinion) (holding that the "anti-disparagement" clause of the Lanham Act discriminated based on viewpoint because "[g]iving offense is a viewpoint"); *Iancu v. Brunetti*, 588 U.S. 388, 390 (2019) (holding that the Lanham Act's bar on registering "immoral[] or scandalous" trademarks violated the First Amendment because it disfavored certain ideas); *see also Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 978 F.3d 481, 500 (6th Cir. 2020) (striking down a restriction prohibiting buses from running ads "likely to hold up to scorn or ridicule any person or group of persons" because the restriction allowed for viewpoint discrimination).

"The government may not censor speech merely because it is offensive to some." *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 894 (6th Cir. 2021) (citation modified).  Even seemingly neutral rules that ban "attacks on people or institutions" "could be considered viewpoint discrimination."  *Youkhanna*, 934 F.3d at 520.  And regardless of the forum, viewpoint discrimination is impermissible.  *Cf. Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009) (explaining that in a limited forum, "a government entity may impose restrictions on speech that are reasonable and viewpoint neutral").

Considering these principles, the district court was correct to conclude that the bulk of Boddy's speech was protected by the First Amendment.  But it erred when it characterized some of Boddy's speech as an ad hominem attack not protected by the First Amendment.

First, we have never held that an ad hominem attack is per se unprotected speech.  And any indication otherwise in *Ison* is dicta.  Thus, it was error for the district court to cite it as our precedent.  Nor has the Court held that ad hominem attacks are without First Amendment protection.  In fact, *Matal* and *Iancu* suggest that Boddy's speech is protected *because* giving offense is a viewpoint.

Second, as a factual matter, Boddy's speech was not an ad hominem attack.  Boddy was criticizing the Board and superintendent for their policy choices as public employees.  An ad hominem attack is a "personal dig or affront . . . [or] the criticism of an adversary's character as opposed to the substance of the adversary's arguments."  *Attack*, *Black's Law Dictionary* (12th

ed. 2024). Boddy's speech was not personal or related to the character of any individual Board member. She did not address any member by name and merely characterized the Board as "failing." And even the use of "cowardice" to describe the superintendent's actions was related to his performance in his public facing role.

"Freedom to criticize public officials and expose their wrongdoing is at the core of First Amendment values." *Barrett v. Harrington*, 130 F.3d 246, 263 (6th Cir. 1997); *see B. A. v. Tri Cnty. Area Schs.*, 156 F.4th 782, 799 (6th Cir. 2025) (Bush, J., dissenting). Accordingly, we hold that Boddy's speech was protected under the First Amendment.

2.

The Board and Grech's claim that curtailing Boddy's speech was necessary to maintain decorum at the Board meeting is also unavailing. The district court demurred, concluding that the "evidence points to Grech's possible mixed motives for curtailing" Boddy's speech, which a jury should decide, not the district court on a motion for a preliminary injunction. We disagree. Grech's justification for cutting Boddy's speech reveals that she curtailed Boddy's speech because she shared viewpoints critical of the Board. And the district court clearly erred when it failed to scrutinize Grech's contradictory testimony.

To be sure, the government may have a constitutional basis for regulating some speech. *Lowery*, 586 F.3d at 435. For example, there is no viewpoint discrimination "when the same result would have occurred in the absence of any illegitimate motive." *Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286–87 (1977)). And the "mixed-motive inquiry is one for the jury, not for us, to decide." *Id.* (citing *Waters v. Churchill*, 511 U.S. 661, 681–82 (1994)). This is because when the record is unclear whether censorship was reasonable or the product of viewpoint discrimination, it can be impossible to determine any likelihood of success on the merits. But this case is not one of those.

Here, the record shows that Grech's application of the rules to Boddy's speech was not content neutral. Grech testified that she made the threat to cut the microphone because Boddy "was starting down the path of calling [people] names." But we condemned this precise rationale in *Ison* as impermissible viewpoint discrimination. 3 F.4th at 894–95. Although Grech

claimed later that she admonished Boddy because of how she was speaking, not because of what she was saying, the district court erred to the extent that it credited this portion of her testimony because the record shows otherwise.

First, consider the idea that Grech cut off Boddy because of her hostile tone. As the district court found—and the video evidence confirms—Boddy's tone and demeanor were objectively professional and consistent with proper decorum. So this first rationale is no help to defendants. Second, that some of Boddy's speech was directed at Lofton alone does not make it unprotected. *See Ison*, 3 F.4th at 895 (holding that a policy that banned "personally directed" speech was facially unconstitutional). Third, the video shows that Boddy did not incite the crowd. To the contrary, Grech acknowledged that her threat to cut the microphone may have riled up the crowd. The video corroborates this understanding. And the district court similarly found that Grech, not Boddy, may have incited the crowd. Fourth, the fact that Grech chided Amber Boddie as well does not demonstrate an even hand: Amber Boddie did not have the microphone ripped away from her, nor did the Board recess during her speaking slot. Quite simply, Amber Boddie was allowed to speak, but Boddy was not.

Grech's other testimony regarding Amber Boddie's reprimand is also problematic because it suggests that speech critical of the Board would violate the decorum rule, but speech praising the Board would not. The Board "may not exclude speech merely because it criticizes school officials." *Lowery*, 586 F.3d at 435.

A factual finding is clearly erroneous when the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (citation modified). Here, the district court failed to make definitive credibility determinations, or probe into Grech's testimony. Instead, the district court framed the facts in the light most favorable to each side, and then determined it was too close to call. But courts have to make these calls, "even the tough ones." *Generation Changers Church v. Church Mut. Ins. Co.*, 168 F.4th 354, 365 (6th Cir. 2026). The correct call here is that defendants provided no legitimate reason to regulate Boddy's speech. The evidence in the record demonstrates that Grech curtailed Boddy's speech because Boddy shared views critical of the Board and Lofton. Thus, we conclude that defendants engaged in impermissible viewpoint

discrimination.  Accordingly, Boddy has shown a strong likelihood of success on the merits of her First Amendment claim.

B.

Boddy offers a second basis for us to conclude she will likely succeed on the merits— Grech ratified a heckler's veto based on the crowd's reaction to her speech.  Boddy asserts that Grech curtailed her protected First Amendment speech, succumbing to the crowd's reaction to it. Defendants counter that no evidence shows that Boddy's speech was subject to a heckler's veto. We disagree and hold that, even in a limited public forum, the government can perpetuate a heckler's veto, which is what it did here.

The "First Amendment does not permit a heckler's veto."  *Bible Believers*, 805 F.3d at 252; *see also United States v. Trump*, 88 F.4th 990, 1015 (D.C. Cir. 2023) ("Of course, the First Amendment generally does not allow speech to be restricted because of some enthusiastic audience members' reactions.").  Rooted in the idea that the government cannot favor one citizen's speech over another, *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 828 (1995), we have held that speech "does not lose its protection under the First Amendment due to the lawless reaction of those who hear it," *Bible Believers*, 805 F.3d at 252. And "[p]unishing, removing, or by other means silencing a speaker due to crowd hostility will seldom, if ever, constitute the least restrictive means available to serve a legitimate government purpose." *Id.* at 248.

In *Bible Believers*, a group of anti-Muslim evangelists attended Dearborn's Arab International Festival with the goal of converting patrons with their offensive and anti-Muslim messages.  *Id.* at 235–36.  At the event, the group was surrounded by "youthful hecklers" who began throwing "bottles and other garbage at the Bible Believers." *Id.* at 241.  The police officers' focus was on the evangelists, and they asked that the group stop using their megaphone to amplify their controversial speech.  *Id.*  We held that the police officers "effectuated a heckler's veto by cutting off the Bible Believers' protected speech in response to a hostile crowd's reaction." *Id.* at 243.

Although *Bible Believers* concerns a heckler's veto in the context of a public forum with police as the relevant government actors, several important throughlines surface regardless of the forum at issue.  When a "peaceful speaker" engages in protected speech and "is confronted by a hostile crowd, the state may not silence the speaker as an expedient alternative to containing or snuffing out the lawless behavior of the rioting individuals."  *Id.* at 252.  Nor can the government "sit idly" by as the crowd imposes a "tyrannical majoritarian rule."  *Id.* at 253.  It should "take any appropriate action to maintain law and order that does not destroy the right to free speech by indefinitely silencing the speaker."  *Id.*

We have yet to apply the heckler's veto to a limited public forum, but its application flows logically from our First Amendment jurisprudence.  After all, a heckler's veto theory is another way to show impermissible viewpoint discrimination—which is improper regardless of the forum at issue.  *Youkhanna*, 934 F.3d at 519.  As the Ninth Circuit has explained, a "claimed fear of hostile audience reaction could be used as a mere pretext for suppressing expression because public officials oppose the speaker's point of view."  *Seattle Mideast Awareness Campaign v. King County*, 781 F.3d 489, 502 (9th Cir. 2015).  Situations could arise "where the asserted fears of a hostile audience reaction are speculative and lack substance, or where speech on only one side of a contentious debate is suppressed."  *Id.* at 502–03.  Similarly, the Third Circuit has suggested that a heckler's veto theory hinges on whether the government's actions were based on the content of the speech.  *See Startzell v. City of Philadelphia*, 533 F.3d 183, 200 (3d Cir. 2008) (discussing the breadth of heckler's veto jurisprudence and explaining that "the more germane question is whether the [government's] actions were based on the content of the speech").

Under this framework, the heckler's veto test turns into a fact-bound test for viewpoint discrimination—here, whether Grech used the disorderly crowd as a pretext to stifle Boddy's speech.  The facts suggest that Grech sanctioned a heckler's veto and in fact gave rise to it.  Boddy shared an unpopular view, and some in the crowd tried to shout her down.  Grech made no effort to quiet the crowd before moving for a recess.  She also testified that she may have helped rile up the audience when she threatened to cut the mic.  As in *Bible Believers*, the government actor did not protect the speaker from the crowd but silenced the speaker in an effort

to maintain decorum.  And because of the forum, Grech had more control over the proceedings than an officer on the street.  The Board's policies empowered Grech to regulate the meetings for reasonable decorum, and she could have used her authority to quiet the crowd instead of Boddy.  Instead, she threatened to cut Boddy's microphone and then did just that.  Further, Boddy was not offered the opportunity to finish her speech after the recess.  So Boddy can show a likelihood of success on the merits under her heckler's veto theory as well.

\*     \*     \*

In sum, the proofs demonstrate that Grech curtailed Boddy's speech because of the viewpoint she expressed.  The district court erred when it credited Grech's proffered reasons for limiting the speech when Grech's reasons were unconstitutional, inconsistent, or plainly unreasonable.  The district court also erred by not deciding the question.  We answer affirmatively that defendants engaged in unconstitutional viewpoint discrimination, under either her forum-based theory or her heckler's veto theory.  Boddy can therefore show "more than a mere possibility of success." *Six Clinics Holding Corp.*, 119 F.3d at 402.

IV.

The second preliminary injunction factor turns on whether the movant is likely to suffer irreparable harm without an injunction.  *Doe*, 872 F.3d at 407.  The district court found that Boddy failed to show irreparable harm.  However, "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *see also Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).  The Board and Grech have failed to rebut the presumption of irreparable harm.

Finally, it is "always in the public's interest to prevent a violation of an individual's constitutional rights." *Doe*, 872 F.3d at 407.  Boddy has a fundamental right to share her views.  Although the public has an interest in orderly school board meetings, *Lowery*, 586 F.3d at 433, the public interest also favors an unbridled marketplace of ideas, especially when those ideas are unpopular or critical of a government official, *see, e.g., Lichtenstein v. Hargett*, 83 F.4th 575, 583 (6th Cir. 2023) ("The First Amendment's protections reach their 'zenith' for political speech.").  Accordingly, the equitable factors also favor Boddy.

No. 25-3490 *Boddy v. Grech, et al.* Page 15

V.

The district court abused its discretion when it denied Boddy's motion for a preliminary injunction.  Accordingly, we reverse the district court and remand with instructions to issue the requested preliminary injunction.

No. 25-3490 *Boddy v. Grech, et al.* Page 16

_____

**CONCURRENCE**

_____

JOHN K. BUSH, Circuit Judge, concurring.  I agree with the majority opinion and join it in full.  I write separately to highlight why this case is important.  At first glance, the dispute looks somewhat blown out of proportion.  It involves a plaintiff quite literally making a federal case out of five minutes of public comment at a school board meeting for a school district where she does not reside.  But a closer look reveals this case goes beyond that.

Regardless of the impact that Darbi Boddy's words might have, the First Amendment protects her from having moderators give in to the demands of the masses.  "[A] function of free speech under our system of government is to invite dispute."  *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949).  It "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger."  *Id.*  A heckler's veto disrupts this purpose and ends a dispute before it can even begin.  In the modern day, we have seen our fair share of crowds stifling free speech and debate.[1]  This problem, however, is not new, and history can give us insight into both the dangers and the solutions.

Several events touching on American slavery illustrate the point.  In the lead up to the Civil War, mobs, vigilantes, wealthy slaveholders, and even the House of Representatives took extreme measures to prevent abolitionist ideas from spreading.  While the caning of Senator Charles Sumner might be the most widely known instance of stifling debate in Congress's halls,[2] a longer lasting veto existed in the House for many years before and after.  We know it as the gag rule.

_____

[1]Jessie Appleby, *What UCLA doesn't want you to know*, Foundation for Individual Rights and Expression (May 8, 2026), https://www.fire.org/news/what-ucla-doesnt-want-you-know;  Sabrina Conza & Alex Morey, *Stanford Law students shut down 5th Circuit judge: A post-mortem*, Foundation for Individual Rights and Expression (March 13, 2023), https://www.fire.org/news/stanford-law-students-shout-down-5th-circuit-judge-post-mortem.

[2]*See* Zaakir Tameez, *Charles Sumner: Conscience of a Nation* 194–200 (2025).

The story begins in the 1830s, with former President John Quincy Adams, son of former President and American Founder John Adams, serving as a representative for Massachusetts in the House of Representatives.  As a Congressman, Adams had such a strong commitment to representative government that he would read aloud on the House floor all petitions that he received from his constituents.[3]  As time went on, more and more of these petitions came from abolitionists asking Congress to end the interstate slave trade.  Rather than listen to these petitions on the House floor and debate their merits, another American Founder's son, Henry Laurens Pinckney, proposed a gag rule, which the House passed.  This rule automatically tabled all petitions relating to slavery or its abolition, "consign[ing them] to oblivion."[4]  John Quincy Adams virulently opposed the gag rule, but he was silenced each time he attempted to express his opposition.[5]

Temporary gags were readopted in 1837 and 1838, with Adams again expressing his outrage over the House silencing his constituents and infringing on his own freedom of speech.[6]  But Adams's efforts at revoking the rules were unsuccessful.  Then, in 1840, the House implemented a stronger form of the gag rule.[7]  Under the prior gag rules, a representative could still present the petition to the House, and the congressional record would reflect that the petition was raised.  The petition simply had no chance of success.  Under the new rule, "an abolitionist petition could not even be presented by a member so that it could be formally received, tabled,

---

[3]Akhil Reed Amar, *Born Equal: Remaking America's Constitution, 1840–1920* 136 (2025); James Traub, *John Quincy Adams: Militant Spirit* 433 (2016).

[4]Amar, *supra* note 3, at 136.

[5]*Id.* at 136–37.  During the vote on the gag rule, Adams proclaimed, "I hold the resolution to be in direct violation of the Constitution of the United States, the rules of this House, and the rights of my constituents."  This was all he could get out before being "hooted and gaveled into silence . . . ."  *Id.*; *see also* Traub, *supra* note 3, at 433.

[6]*Journal of the House of Representatives*, 25th Cong., 2d sess. 89 (Dec. 22, 1837); *Congressional Globe*, 25th Cong., 3rd sess., 27–28 (Dec. 12, 1838).

[7]*Congressional Globe*, 26th Cong., 1st sess., 130 (Jan. 20, 1840).

No. 25-3490 *Boddy v. Grech, et al.* Page 18

and buried."[8] This new rule was a permanent one, so it did not need to be voted on again during each session.[9]

But Adams found his way around these gags (even the 1840 one) and continued speaking out for free soil and the end of slavery. He would do so by presenting petitions arguing against the gags themselves rather than against slavery, against the annexation of Texas (which had strong implications for the perpetuation of slavery),[10] or, in one instance, through a petition that called for the capital to be moved farther north "where the principles of the Declaration of Independence are not treated as a mere rhetorical flourish."[11] These workaround petitions allowed Adams to raise his constituents' concerns, address the evils of slavery, and gain attention from newspapers across the country.

The Senate, meanwhile, elected not to adopt an outright gag. Though they by no means performed any better as ambassadors for First Amendment liberties. In 1836, South Carolina Senator John C. Calhoun attempted to follow the lead of his fellow South Carolinian, Pinckney, and impose a gag rule in the Senate that would prevent petitions on slavery from being debated in the Senate chamber.[12] Although many of the Southern senators agreed with the sentiment, they worried that denying citizens their civil right to petition would only benefit the abolitionist movement by turning "the troublesome enemies of slavery . . . into noble champions of civil liberties."[13]

As it turns out, those senators were right. The longer Adams struggled against the gag rule, the more attention he received. Continually trying to shut down debate and prevent the free

---

[8]Amar, *supra* note 3, at 137.

[9]*Id.* at 137–38.

[10]Jane Armstrong Hudiburg, *John Quincy Adams: Fiery to the End*, U.S. Capitol Hist. Soc'y, *Capitol Stories* (2025), https://capitolhistory.org/USCHS-Capitol-Stories-files/USCHS-Capitol-Stories-John-Quincy-Adams.pdf.

[11]*Id.*

[12]*Slavery Petitions and the Gag Rule*, U.S. Senate, https://www.senate.gov/about/powers-procedures/rules-procedures/slavery-petitions-gag-rule.htm (last visited May 12, 2026).

[13]*Id.*

exchange of ideas only led to shining a brighter spotlight on Adams, and on the abolitionist cause.[14]

But it was not only members of Congress who wanted to silence debates on slavery. Pro-slavery activists relied on mob rule to silence the abolitionist cause rather than debate the issues on their merits and risk losing the argument. This was what happened on December 3, 1860. One month after Abraham Lincoln's election to the Presidency and less than a month before South Carolina would announce its plan to secede from the United States, Frederick Douglass met with fellow abolitionists in Boston to discuss how slavery could be defeated.[15] But before they could begin in earnest, a violent mob disrupted the proceedings and forced the meeting to be abandoned. Six days later, Douglass, remembering the events of the first meeting, asked for the opportunity to give some remarks on what transpired there. He followed with a powerful defense of free speech.

Even though the initial meeting occurred in Massachusetts, the home of John Quincy Adams, it was nonetheless "invaded, insulted, [and] captured, by a mob of gentlemen, and thereafter broken up and dispersed by order of the Mayor, who refused to protect it, though called upon so to do."[16] Douglass's characterization of the mob as "gentlemen" was pointed—the mob was comprised of men who "who pride themselves upon their respect for law and order."[17] But the law they respected was not the Constitution. "The law of free speech and the law for the protection of public meetings they trampled under foot, while they greatly magnified the law of slavery."[18] Douglass implored his audience to embrace free speech as "the great moral renovator of society and government."[19] Mob rule was the perpetuator of slavery, and free speech the thing that would drive it out. Douglass knew that "[s]lavery cannot tolerate free

---

[14]Amar, *supra* note 3, at 140.

[15]Frederick Douglass, *A Plea for Freedom of Speech in Boston*, The Frederick Douglass Papers (Dec. 9, 1860), https://frederickdouglasspapersproject.com/s/digitaledition/item/9060.

[16]*Id.*

[17]*Id.*

[18]*Id.*

[19]*Id.*

speech. Five years of its exercise would banish the auction-block and break every chain in the South."[20]

Given this historical context, we can turn to what happened at the Xenia school board meeting. I do not mean to make a direct comparison between what transpired here and the abolitionist efforts against slavery. The denial of public comment at a school board meeting is, of course, not the same thing as what happened in the run-up to the Civil War. But speech is speech, and the right to petition applies equally at all levels of government, even locally.

I am reminded of Lincoln's Lyceum Address,[21] in 1838, over twenty years before he would assume the Presidency. Then, he spoke on the dangers of mob rule, sharing examples from his time of vigilante mobs taking the law into their own hands. He asked, "What has this to do with the perpetuation of our political institutions?"[22] And he answered: "[I]t has much to do with it. [Mob rule's] direct consequences are, comparatively speaking, but a small evil; and much of its danger consists, in the proneness of our minds, to regard its direct, as its only consequences."[23] Put differently, the consequences of shutting down speech go well beyond preventing that individual speaker from expressing his ideas.

It would be a mistake to discount the importance of speech at a school board meeting. The direct consequences of shutting down a person's public comments are not the only consequences. Preventing citizens from exercising their rights of speech and petition leads to contempt for First Amendment rights such that the "the walls erected for the defense of the persons and property of individuals, are trodden down, and disregarded."[24] And when our rights go unprotected, we lose faith in government and the law more generally. Lincoln warned of this,

---

[20]*Id.*

[21]Abraham Lincoln, *Address Before the Young Men's Lyceum of Springfield, Illinois: The Perpetuation of Our Political Institutions*, (Jan. 27, 1838), https://www.abrahamlincolnonline.org/lincoln/speeches/lyceum.htm.

[22]*Id.*

[23]*Id.*

[24]*Id.*

too: we cannot always know when danger is approaching, but "if it ever reach us, it must spring up amongst us."[25]

These historical examples help diagnose the problem.  Danger is creeping up amongst us. Ordinary people and those in power alike are shutting down the free exchange of ideas and attempting to silence their fellow citizens.

Thankfully, history also provides the solution.  First, the way to fight against the restriction of speech is through more speech.  Adams and Douglass did not remain quiet after their speech was disrupted; they continued advocating for the freedom of speech, despite widespread hostility to their views.  For the second, I again turn to Lincoln: "As the patriots of seventy-six did to the support of the Declaration of Independence, so to the support of the Constitution and Laws, let every American pledge his life, his property, and his sacred honor . . . ."[26]  The counter to mob rule, to shout downs, to the heckler's veto, is a love and devotion to the Constitution and the law.  Those who venerate the Constitution cannot tolerate a heckler's veto because "interpreted as it ought to be interpreted, the Constitution is a glorious liberty document,"[27] "and [l]iberty is meaningless where the right to utter one's thoughts and opinions has ceased to exist."[28]  The two are inseparably intertwined.

I recognize that protection of unpopular speech will not always be easy.  Many speakers spread ideas that inflame our passions and cause great hurt or offense.  But instead of relying on passion as our guide when faced with offensive or harmful ideas, we must turn instead to

---

[25]*Id.*

[26]*Id.*

[27]Frederick Douglass, *What to the Slave Is the Fourth of July?*, Teaching American History (July 5, 1852), https://teachingamericanhistory.org/document/what-to-the-slave-is-the-fourth-of-july/; *see also* Bradley Rebeiro, *Frederick Douglass and the Original Originalists*, 48 BYU L. Rev. 909, 913–16 (2023) (describing Douglass's originalist interpretation of the Constitution as a pro-liberty document).

[28]Douglass, *supra* note 15.

reason.[29]   For "cold, calculating, unimpassioned reason, must furnish all the materials for our future support and defen[s]e."[30]

The dispute at issue here may not be the most important that we as federal judges will see in our time on the bench, but today we vindicate the right to speak.  "No right was deemed by the fathers of the Government more sacred than the right of speech."[31]   I hope that we as citizens will do as Lincoln suggested and pledge ourselves to upholding this sacred right, even when we do not like what the speaker has to say.  Because while the danger of shouting down a speaker may seem slight in its direct consequences, the indirect consequence to the rule of law may be profound.

---

[29]Lincoln, *supra* note 17.

[30]*Id.*

[31]Douglass, *supra* note 15.